UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> SYSTRANS FREIGHT SYSTEMS, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> CIVIL ACTION <br> NO. 05-10999-RCL |

## AFFIDAVIT OF ROBERT GLENN MILLER

I, ROBERT GLENN MILLER, first being duly sworn, hereby depose and say:

1.      I am currently the Executive Vice President, Asia/Pacific Business Development, of Iron Mountain Incorporated (NYSE: IRM).  From 2000 until December 31, 2004, I was the President and Chief Operating Officer of Iron Mountain Information Management, Inc. ("Iron Mountain").  I make this affidavit from facts within my personal knowledge and I believe all matters set forth herein to be true.

2.      Iron Mountain is a wholly-owned subsidiary of Iron Mountain Incorporated (NYSE: IRM), the world's leader for outsourced records and information management services.

3.      I executed the Contract for Logistic Management Services, Contract No. 2002111 (the "Contract"), between Iron Mountain and Systrans Freight Systems ("Systrans").  A true and accurate copy of the Contract is attached hereto as Exhibit A.  The Contract was drafted by Systrans.  Since the inception of Iron Mountain's contractual relationship with Systrans, I have been directly involved with and am therefore familiar with the parties' contractual performance, or lack thereof.

4.      Jim Neebling, Systrans' President, operates and manages Systrans and substantially all interactions between Iron Mountain and Systrans relating to the relevant events have involved and continue to involve Mr. Neebling.

5.      In conjunction with and upon execution of the Contract, Iron Mountain agreed to advance Systrans an initial amount of $105,000 (the "Initial Advance"). The Initial Advance was to be applied to startup expenses related to the Contract. Systrans agreed to repay the Initial Advance. Systrans has since received two additional advances from Iron Mountain totaling $90,500. As described in greater below, Systrans also owes Iron Mountain more than $78,500 resulting from overbilling and duplicative billing by Systrans which Iron Mountain discovered as a result of an internal audit.

6.      From the very beginning of the business relationship between Iron Mountain and Systrans, both parties knew and understood that Systrans would possess Iron Mountain's confidential and proprietary information in order to perform its obligations to Iron Mountain under the Contract. Accordingly, the Contract specifically provides, in Section III.B., for the maintenance and protection of Iron Mountain's confidential and proprietary information.

7.      The confidential and proprietary information that Iron Mountain provided to Systrans includes (i) Iron Mountain's customers' names in the districts where Systrans performed services for Iron Mountain, (ii) customer contact information (including name, address, phone numbers) in those districts, (iii) charges for deliveries to the customers in those districts, and (iv) the volume and frequency of deliveries to those customers. Iron Mountain takes great care to maintain and protect the confidentiality of this information. For example, because Iron Mountain charges its customers for each delivery of records (as does its competitors), knowing which customers have high-frequency deliveries will reveal to a

-2-

competitor which of Iron Mountain's customers offer particularly lucrative opportunities if poached.

8.     The Contract also requires that Systrans provide certain management services related to the courier services including, but not limited to, paying vendor invoices from courier companies that Systrans engages for performance of the Contract.  Since Systrans merely manages and coordinates transportation and logistics needs (as explained on its website, a portion of which is reprinted and attached as Exhibit C), Systrans' payments to the couriers (funds for which Systrans receives from Iron Mountain) is critical.

9.     I have been informed by Mr. Neebling that, despite payments by Iron Mountain to Systrans through mid-April, Systrans has not paid certain vendor invoices, as required by the Contract.  Systrans has acknowledged, both orally and in writing, that it has not paid its vendors performing deliveries on Iron Mountain's behalf from February through mid-April of this year despite Iron Mountain's having paid $724,675.37 to Systrans during that time, an amount that was intended under the Contract to include all payments to courier vendors.  Systrans, through Mr. Neebling, has informed Iron Mountain that it owes its courier vendors at least $389,000 on outstanding invoices for deliveries made on Iron Mountain's behalf from February through mid-April of this year.

10.     During the term of the Contract, Systrans overcharged Iron Mountain.  At my direction, Jim Andrusko, Iron Mountain's Controller, conducted a thorough audit of the invoices that Systrans had sent to Iron Mountain for payment.  As of January 19, 2005, Iron Mountain and Systrans agreed that the aggregate amount of the overcharges was in excess of $78,500 (the "Overcharges").  Systrans has failed to fully repay these overcharges or offset them from amounts invoiced to Iron Mountain.  In fact, of the Initial Advance ($105,000), the two

-3-

additional advances (totaling $90,500), and the Overcharges (more than $78,500), Systrans has repaid or offset only approximately $108,000, leaving approximately $166,000 due and owing from Systrans to Iron Mountain on those advances and overcharges.

11.    On May 5, 2005, three representatives of Iron Mountain, namely myself, Mr. Andrusko and David Barlow, a Senior Vice President, met with Mr. Neebling at Iron Mountain's offices in Collegeville, Pennsylvania, to discuss and attempt to resolve their differences.  During that meeting, Mr. Neebling again acknowledged that it had not paid the vendor invoices as required by the Contract and that the total amount due to its vendors for deliveries on behalf of Iron Mountain totaled more than $389,000.  Moreover, Mr. Neebling twice acknowledged **and agreed** that Iron Mountain would not be required to pay the invoices from Systrans from the weeks of April 30 and May 6, 2005, because of Systrans' failure to pay its vendors.  Instead, Mr. Neebling on behalf of Systrans agreed that Iron Mountain could pay the couriers directly, which Iron Mountain has undertaken to do.

12.    On May 13, 2005, in an email to my attention, Mr. Neebling of Systrans threatened Iron Mountain that, if Iron Mountain did not pay the invoices for the weeks of April 30 and May 6, 2005 (which Systrans acknowledged and agreed would not be paid), Systrans would sell Iron Mountain's confidential and proprietary information.  A true and accurate copy of the email containing this threat is attached hereto as Exhibit B.  Mr. Neebling also threatened to begin sending demand letters to Iron Mountain's customers that had received deliveries from the couriers that Systrans contracted to furnish and provide.

Signed under the penalty of perjury this 20th day of May, 2005.


/s/ Robert Glenn Miller
Robert Glenn Miller

{B0407892; 1}

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 20th day of May, 2005, served on counsel listed below, by email and FedEx, a true and correct copy of the foregoing **Affidavit of Robert Glenn Miller**.


Read K. McCaffrey, Esq.
Patton Boggs LLP
2550 M Street, NW
Washington, DC  20037


/s/ Samual A. Miller
Samual A. Miller

{B0407892; 1}

# EXHIBITS TO
# AFFIDAVIT OF ROBERT GLENN MILLER

**EXHIBIT A**



## CONTRACT FOR LOGISTICS MANAGEMENT SERVICES
## CONTRACT No. 2002111

**THIS CONTRACT,** made and entered into as of this 1st day of May 2003, by and between Iron Mountain Records Management, a division of Iron Mountain Information Management, Inc., with an address of 1000 Campus Drive, Collegeville, Pa. 19426 (hereinafter called "IMC") and, as used in this Contract, these terms shall include any present or future entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with IMC and Systrans Freight Systems, Inc.. with an address of 571 West Lake Avenue Suite 5, Bay Head, NJ 08742 (hereinafter called "Contractor")

**WITNESSETH,** that the Contractor, for and in consideration of the payments hereinafter specified and agreed to, hereby covenants and agrees to furnish and deliver all and manpower (possessing the particular training, ability, knowledge, and experience), materials and equipment to effectively provide the services for IMC as set forth in this "Contract".

IMC provides storage at its facilities of business, legal, medical and other records for its clients; and such clients frequently request delivery or pickup of containers or files of records, which IMC accomplishes either with its own fleet of vehicles and drivers, or by using third-party couriers.

### I.  TERM

The term of this Contract is as stated on the cover page. This Contract will automatically renew on a year-to-year basis, unless either party gives written notice of termination, such notice to be given at least 120 days in advance of the termination date. Notwithstanding the foregoing, IMC may terminate this Contract for convenience at any time during the first six (6) months of the term, upon sixty (60) days' notice.

### II.  SCOPE OF WORK

#### A.    General Duties

1.    Transportation Services – Contractor shall immediately upon execution of this Contract begin a study of IMC's courier network, identifying all locations, specific routes and all costs associated with the network. Contractor shall simultaneously begin negotiations with the current providers of courier services in order to reduce costs and manage the daily operations of the network. IMC's contractual provisions currently in force with any courier or delivery services shall be respected and managed to their proper conclusion, with the consent of the contractor if study and negotiations so indicate and only as approved in advance by IMC. Any correspondence regarding existing courier services will be issued by IMC to be enforceable. The Contractor may seek to modify any such provisions (with this Contract of the contract courier.

The Contractor will provide courier services to the IMC markets, facilities and sites in the continental United States. Contractor will provide courier services to operate to, from and between Iron Mountain customers and facilities where courier services are not covered by existing contracts, and on a District-by-District basis, as approved by IMC. Contractor shall comply with all applicable federal, state and local laws, rules and regulations relating to the performance of the Services, including without limitation, all federal, state and local taxes, and social security taxes, applicable federal, state and local laws pertaining to wages,



hours and other terms and conditions of employment. Contractor will observe any customer-required rules and procedures while on premises of IMC customers.

Contractor will provide total coverage of all services on a 7-day, 24-hour basis. Services shall be provided on all IMC observed holidays as requested by IMC. It is also agreed that the Contractor's central dispatch operation will remain staffed until such time as the last scheduled delivery is received at IMC's customer/pickup facility.

Contractor will provide access to the following modes of courier and various transportation services to IMC.
- Ground courier services performed by car, van, or step van.
- Less than truckload services performed by 12'-24' straight truck with or without liftgate.
- Truckload services
- Air courier services – domestic and international – next flight/overnight 2nd day, as a supplement to other primary service contractors and only as specifically directed by IMC.

2.  Management Services – Contractor will provide the following management services to IMC.
- 7-day, 24-hour customer service courier response and 24x7 coverage with services and transactions.
- Selection of vendors to meet both scheduled and on-demand courier services requests.
- Re-negotiation of current vendor courier contracts affected by this Contract while preserving and respecting current terms contained within those Contracts.
- Direct contractual and day-to-day operational supervision of all vendors delivering the services required by the contract.
- Payment of all vendor invoices associated with vendors.
- Provide IMC courier network reporting including delivery times (based on interface with IMC mainframe) and management reporting in the format and within the time parameters requested by IMC.

3.  Technology/Systems Applications – Contractor will provide the following technology to IMC.
- Installation of Contractor's transportation management software at Iron Mountain locations.

4.  Compensation and Billing – IMC shall pay Contractor for the courier network services based on the pricing and conditions listed on Schedules "A", "B", "C", "D", "E". Contractor shall submit electronic invoices to IMC in such form and with such supporting documentation, affidavits, waivers, and releases, as IMC may reasonably request and at the times stipulated. IMC shall pay Contractor weekly following IMC's receipt of Contractor's weekly invoice. Invoice shall provide an attachment with a breakdown showing the activity of each business line services, the date services were performed and the charge for the work performed.

5.  Initial Payment – Upon execution of this Contract, IMC will pay contractor an initial amount of $105,000. This payment will be applied to startup expenses related to the project. Contractor will credit IMC $2,000 per week off the weekly invoice. In the event this contract is cancelled, IMC may offset the full amount outstanding, and



Contractor shall reimburse IMC for any portion of the initial amount not offset. Contractor hereby grants IMC a security interest in the equipment purchased by Contractor at the inception of this Agreement. Upon request, Contractor will execute UCC financing statement to perfect this security interest.

**B.      Contractor Employees and Subcontractors**

It is expected that Contractor's employees, and any subcontractors and their respective employees collectively known as "Personnel" assigned to this account will have frequent, personal contact with customers, employees, visitors and vendors of IMC. Accordingly, it is agreed that the Contractor's employees and subcontractors shall meet the highest standard of appearance and demeanor. Contractor's personnel shall, at all times, demonstrate a high degree of professionalism in their treatment of IMC's customers, employees, visitors and vendors of IMC as is appropriate to the environment, conduct and business of IMC. If any customer requests that any personnel cease servicing such customer, Contractor shall immediately cause such individual to stop servicing the requesting customer.

Contractor shall require all of its on-site personnel to meet the approval of IMC. All personnel shall be bonded. IMC shall receive a copy of the bonds covering personnel.

Contractor shall ensure that all personnel assigned to operate a motor vehicle, or other such equipment, meet all special licensing requirements. All drivers must possess and maintain a safe driving record.

Contractor shall ensure that all assigned personnel pass a comprehensive pre-employment background and reference check as is acceptable to IMC and comparable to that undertaken by IMC on its own employees, including but not limited to fingerprinting, credit checks, criminal background checks and pre-employment drug testing. Contractor shall periodically perform random updates and checks as deemed necessary to insure continued compliance.

IMC reserves the right to fingerprint and photograph all employees assigned under this Contract, or require that Contractor perform same, and subject Contractor personnel to any other security related pre-employment screening that is regularly required of IMC personnel.

Contractor will ensure that all in-house foot messengers and drivers wear appropriate business attire and carry proper identification issued and validated by Contractor. Further, personnel shall present any such additional identification necessary to confirm the validity of Contractor-supplied identification, such as a valid driver's license.

Contractor will recruit, employ, train, supervise, direct, discipline, and, if necessary, discharge Contractor's employees working at IMC facilities, or delivery to customers' sites.. Contractor's employees shall be able, qualified, and trained personnel who shall be responsible solely to Contractor. Contractor agrees to transfer or otherwise remove any Contractor personnel requested by IMC at IMC's sole discretion, with or without cause. Contractor will require the same of all subcontractors and their personnel.

Contractor and IMC acknowledge that Contractor is an independent contractor and that neither Contractor nor its personnel are employees of IMC. Further, it is agreed and assured that Contractor and its personnel will not participate in or be entitled to any benefits under IMC's benefit program now existing or hereafter created, including, without limitation,. IMC's pension plan, profit sharing plan, medical, life or accidental death insurance plans. Personnel shall, at all times, remain employees or Contractor or its Subcontractors, which shall be solely responsible for the payment of



each employee's benefits and entire compensation, including employment taxes, workmen's compensation, and any similar taxes and requirements associated with employment.

Contractor's personnel will comply with all IMC's security regulations regarding entering IMC's facilities and while in the conduct of the services on the IMC premises. Any employee or contractor who disrupts IMC's normal operations shall be removed immediately by Contractor upon IMC's request.

Contractor warrants that all Contractor personnel provided to IMC are US citizens or are legally entitled to accept employment with Contractor or its subcontractors and to perform services under this Contract.

### C.    Set-aside

Contractor agrees to utilize "8-A" minority owned vendor for services representing 15% of the total revenue received by Contractor under this contract.. Contractor will bill IMC for difference between the vendor rate and the agreed rate for services. Contractor will process "8-A" vendor invoices for direct payment from IMC to vendor.

### D.    Supervision

Contractor shall be solely responsible for the direction and supervision of all Contractor personnel assigned to the facilities. Contractor shall provide a sufficient number of line supervisory personnel to ensure Contractor's successful performance of its obligations under this Contract.

Contractor shall designate an Account Manager who shall be a member of the Contractor's management team and shall be accessible regarding any communication relevant to the Services.

Contractor's supervisors and the Account Manager shall meet regularly with IMC's designated representatives to monitor performance under this Contract, and to review performance as herein described. It is the Contractor's responsibility to initiate and facilitate these meetings. Contractor's supervisory personnel shall be available at reasonable times to consult with IMC's designated representatives.

IMC, as owner or lessee of its property and facilities, has the exclusive right to control and deny access to those premises for any reason to any individual including the personnel or agents of the Contractor.

Contractor shall insure that all vehicles provided in the performance of the services shall be less than five (5) years of age unless special exception has been granted by IMC, possess adequate two-way communication, and be maintained properly. Vehicles shall be inspected monthly by Contractor and service records reviewed. All vehicles must be secured at all times. Cargo areas will be equipped with proper security measures to protect the interests of IMC. These provisions apply not only to Contractor but to any subcontractors as well.

### E.    Loss/Reconstruction of Documents

In the event there is a loss or discrepancy, contractor shall cooperate in conducting a full investigation. Contractor will be liable for up to a maximum of $100,000 in reconstruction costs, as defined below.



1.  Cost necessary to reconstruct and photocopy related documents and other items involved. IMC agrees to cooperate and reasonably aid Contractor in the reconstruction of the items lost.

2.  Reasonable costs of IMC in connection with the reproduction of documents involved.

3.  Such other necessary and reasonable costs and expenses as are directly related to the loss and reconstruction of destroyed and related documents.

## III.  GENERAL TERMS AND CONDITIONS

### A.  Warranty

The Contractor warrants that the services performed under this Contract will be done in a correct and accepted industry standard manner and that all services performed will be free from omissions, errors and miscalculations. This warranty will be effective for a period of 30 days from the date the work is completed, regardless of any termination. Subject to the limitations in Section II E above, the Contractor will remedy any services declared defective or incorrect by IMC and will perform again or rebate the cost of those services as appropriate provided IMC gives the Contractor notice promptly upon discovery.

### B.  Contractor Confidentiality

The Contractor and IMC acknowledge that in the negotiation and performance of this Contract, confidential and proprietary information of each has been and will be made available to the other. The parties agree to use reasonable efforts to maintain the confidentiality of such material and not to make any internal use of such material not required under this Contract. Neither party will disclose the information to any third party without prior written authorization from the disclosing party, and will not use the information received by it, except to those of its employees, agents and consultants whose duties justify the need for access to the information provided that such individuals are subject to obligations or secrecy and limited use commensurate in scope with this Contract. These obligations will apply to verbal information as well as specific portions of the information that are disclosed in writing or other tangible form even if not marked to indicate its confidential nature. These obligations will not apply to any of the information which:

1.  Was known to the receiving party prior to receipt under this Contract, as demonstrated by the receiving party's records; or
2.  Was publicly known or available prior to receipt under this Contract, or later becomes publicly known or available through no fault of the receiving party; or

3.  Is disclosed to the receiving party without restrictions on disclosure by a third party having the legal right to disclose the same; or

4.  Is disclosed to a third party by the disclosing party without an obligation of confidentiality; or

5.  Is independently developed by an employee, consultant, or agent of the receiving party without access to the information as received under this Contract; or



6.  The receiving party is obligated to produce as required by law, lawfully issued subpoena, or a court order, provided that the disclosing party has been given notice thereof and an opportunity to waive its rights or to seek a protective order or other appropriate remedy.

Upon written request of a disclosing party, the receiving party will return all information disclosed in written or tangible form, and the receiving party will destroy all of its copies, excerpts or notes, and files – computer, tape and paper, made by it which contain any portions of the information unless otherwise provided for by the parties

**C.    Governing Law**

This Contract shall be governed by the laws of the State of New Jersey.

**D.    Indemnity**

To the fullest extent permitted by law, and subject to any limitations expressly set forth in this Contract, Contractor, its agents, employees, servants and subcontractors (collectively, "Indemnifiers") shall hold harmless and indemnify IMC, its affiliated companies (as their interest may appear), its officers, directors, employees, agents and servants (collectively "Indemnitees") from any liabilities, injury, death, penalties, losses, costs, damages, claims, expenses, attorney's fees, expenses of litigation, suits, judgments, liens and encumbrances, arising out of or resulting from the negligence or willful misconduct of Contractor and/or its employees, subcontractors, agents or servants in performing the services under this contract. In the event any legal proceeding is brought against an Indemnitee solely due to any of the above activities, the Indemnifier agrees to defend the interests of the Indemnitee at no cost to the Indemnitee, so long as the Indemnitee provides prompt notice to the Indemnifier of the legal proceeding and permits the Indemnifier sole control over the defense in such legal proceeding.

**E.    Insurance Requirements**

1.  All insurance policies of either party affecting this contract shall include a clause or endorsement denying the insurer any rights of subrogation against the other party to the extent rights have been waived by the insured before the occurrence of injury or loss. IMC and Contractor waive any and all rights of recovery against the other for injury or loss due to the hazards covered by policies of insurance required by this contract to the extent of the injury or loss covered thereby. To that end, neither party shall seek to recover under any indemnity hereunder to the extent the loss covered thereby is recovered or recoverable under any policy of insurance carried by such party.

2.  Contractor shall, at its own cost and expense, maintain commercial general liability (CGL) insurance written on a per occurrence basis, to include coverage for Personal Injury, Contractual, Contingent, Products/Completed Operations and Contractual Liability and Broad Form Property Damage, with limits in at least the following amounts:

$1,000,000 per occurrence Combined Single Limit
$5,000,000 Umbrella Policy
$    50,000 per occurrence limit for Fire Legal Liability
$     5,000 per person per occurrence limit for Medical expenses



3. Contractor shall, at its own cost and expense, maintain commercial business auto liability insurance in an amount of not less than $1 million combined single limit. Such policy shall include coverage for all vehicles owned, hired, non-owned and borrowed by the Contractor or any of its subcontractors in the performance of the services covered by this contract.

4. Contractor shall at its own cost and expense, maintain Workers' Compensation Insurance, unemployment compensation insurance and any other insurance that may be required by law with respect to Contractor's employees and in accordance with statutory requirements for all states in which services are to be performed under this contract. Minimum employer's liability limits are:

$500,000 Bodily injury by accident, for each accident
$500,000 Bodily injury by disease, for each employee
$500,000 policy limits for bodily injury by disease

5. All insurance policies or bonds required by this Contract shall be issued by insurance companies with a Best Rating or Standard and Poor's Claims-paying ability rating of not less than "A".

6. Upon IMC's written request, Contractor shall provide IMC a certificate of insurance evidencing such required coverage. In addition, IMC shall be notified of any cancellation of such policies with at least ten (10) days' prior written notice.

7. Contractor's liability insurance shall identify IMC as an additional insured.

8. Contractor shall require that each subcontractor used by Contractor in providing the services hereunder must carry the same insurance as is required to be carried by Contractor.

9. Contractor shall, at its own cost and expense provide cargo insurance coverage in the amount of $100,000. Cargo insurance to include "Reconstruction of Documents" endorsement

F.    Contractor Employees

Contractor shall recruit, hire, train, supervise, direct, and if necessary, discipline, transfer and discharge management and non-management employees of Contractor performing services hereunder. All personnel employed by Contractor shall at all times and for all purposes be solely in the employment of Contractor while performing the services described herein. Contractor agrees to comply with all federal, state and local laws and regulations applicable to Contractor as employer, including but not limited to those relating to employee withholding, unemployment taxes, workers compensation insurance and equal employment opportunity. It is understood and agreed that Contractor is an independent supplier, and is not an agent of IMC.

G.    Amendments

No amendment of this Contract will be effective unless it is reduced to writing and executed by both appropriate and authorized signatory parties of the Contract. In the event of the need to implement a change order IMC will discuss the scope of Contract with the Contractor and adjust the compensation relative to the increase or decrease of services required.



### H.    Termination

*This Contract may be terminated upon written notice, upon the occurrence of the following conditions:*

1.    IMC may terminate if:

   A.    Contractor fails to provide adequate service during the first 180 days of service.

   B.    Contractor breaches a material provision of this Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from IMC specifying the breach.

   C.    A petition is filed by or against Contractor under bankruptcy law or any other insolvency laws providing for the relief of debtors, termination shall be effective immediately upon receipt of written notice from IMC.

   D.    For convenience at any time during the first six (6) months of the term on thirty (30) days' notice.

2.    Contractor may terminate if:

   E.    IMC breaches a material provision of the Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from Contractor specifying the breach.

   F.    A petition is filed by or against IMC under bankruptcy law or any other insolvency laws providing for the relief of debtors; and

The merger or acquisition of IMC into or by another entity shall not constitute a breech which would enable Contractor to terminate this Contract, provided the surviving entity executes a substantially similar Contract with Contractor based upon substantially similar facts and circumstances.

Cancellation of the contract does not relieve the Contractor of the obligation to deliver and perform on outstanding work prior to the effective date of the cancellation. All sums due to Contractor up to the date of termination shall be paid in accordance with the terms of the Contract.

### I.    Limitation of Warranties and Liability

THE LIMITED WARRANTIES SET FORTH IN THIS CONTRACT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, AND CONTRACTOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE.

Each party's ("First Party") liability to the other party ("Other Party") arising out of this Contract or for any other reason relating to or arising from the products and services provided under this Contract, including claims for contribution or indemnity will be limited to the amounts the First Party has paid to or received from the Other Party under this Contract. IN NO EVENT WILL WITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.



**L.** **Assignment**

Contractor may not assign this Contract without the prior written consent of IMC. Subject to the foregoing, this Contract shall be binding upon, and shall inure to the benefit of the successors and assigns of IMC and the Contractor.

**M.** **Severability**

If any term or provision of this Contract shall be held unenforceable by a court or competent jurisdiction, the remaining provisions of this Contract shall not be affected by such unenforceability and shall be valid and enforceable to the fullest extent permitted by law.

**N.** **Modifications**

Any handwritten changes, to include but not limited to additions, rewordings, deletions, etc. made to the face of this document must be initialed and dated by both appropriate and authorized signatory parties of the Contract to indicate both parties' acceptance and Contract with the change (s) for it to be considered a valid and binding part of the signed Contract.

**O.** **Mediation and Arbitration**

The parties agree that any disputes arising in connection with the interpretation of this Contract or the performance of any party under this Contract, or otherwise relating to this Contract, shall be treated in accordance with the procedures set forth in this paragraph. Such treatment shall occur prior to any party pursuing arbitration or litigation in connection with such disputes. The dispute shall be referred for resolution to Garry Watzke for IMC and James Neebling for the Contractor. Such procedure shall be invoked by either the Contractor or IMC presenting to the other a "Notice of Request for Resolution of Dispute ("a Notice") identifying the issues in dispute sought to be addressed hereunder. A telephone or personal conference of those executives will be held within 10 days after the delivery of the Notice.

**P.** **Privacy Addendum**

Contractor shall execute the Privacy Addendum in the form annexed to this contract and shall cause each subcontractor to execute the Privacy Addendum as part of such subcontractor's Contract with Contractor, provided that IMC shall have the direct right to enforce the terms of the Privacy Addendum against any subcontractor.





Date: 5/01/03

# SCHEDULE "A"
## HALF DAY / RUSH DELIVERY NORTHEAST

- Rates to be established and inserted after 90 day test period

- Test period rates will not exceed current rates

- New rates to be inserted after test will reflect a minimum savings of 2%, or 98% of current rates





Date: 5/01/2003

## SCHEDULE "C"
## HALF DAY / RUSH DELIVERY
## MIDWEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)





Date: 5/01/2003

## SCHEDULE "D"
## HALF DAY / RUSH DELIVERY SOUTHWEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates





Date: 5/01/2003

## SCHEDULE "E"
## HALF DAY / RUSH DELIVERY
## WEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)



## CONTRACT FOR COURIER SERVICES

*Confidential*

**CONTRACT NUMBER:**    2002111

**CONTRACT TERM:**    **May 1, 2003 through April 30, 2006**

**CLIENT:**

Iron Mountain Records Management,
a division of Iron Mountain
Information Management, Inc.
1000 Campus Drive
Collegeville, Pa 19426

**CONTRACTOR:**

Systrans Freight Systems, Inc.

571 West Lake Avenue, Suite 5
Bay Head, NJ 08742

**SCOPE OF CONTRACT:**

Contractor shall furnish and deliver all the manpower, materials, and equipment to provide logistics/courier management services for specified Iron Mountain facilities, (the "Service Delivery Area"). Management services will be responsible for "Half-Day", "Rush" shipments from IMC facilities to IMC customer sites.

**IN WITNESS WHEREOF,** the parties have caused this Contract to be executed with the intent to be bound by its provisions. Said Contract is indicated and evidenced by the signatures of their duly authorized officers affixed below.

**Authorized Signatures:**

**IRON MOUNTAIN RECORDS
MANAGEMENT, a division of Iron
Mountain Information Management, Inc..**

By:
Print Name:    Bob Miller

Title:    President
Phone:    610-831-2315

Date:    5/12/03

**SYSTRANS FREIGHT SYSTEMS, INC.**

By:
Print Name:    James Neebling

Title:    President
Phone:    732-295-9914

Date:    4/29/03

# EXHIBIT B

**From:** Jim Neebling [mailto:jimneebling@systransfreight.com]
**Sent:** Friday, May 13, 2005 11:03 AM
**To:** bob.miller@ironmountain.com
**Cc:** rmccaffrey@pattonboggs.com; garry_watzke@ironmountain.com
**Subject:** Systrans

Bob

I don't know if we are still in a negotiation status base on Tom's attorney's email. I have clarified with Mr. McCaffrey that his settlement offer _did_ include the numbers I proposed for Systrans. I will wait to hear from either you or Mr. McCaffrey on Monday afternoon.

Since the tone of our negotiations have been far from pleasant, I want your decision on the open invoices from the final 2 weeks of business. I see no good faith in your tone, threats, and don't appreciate your comments. I feel this is leading towards a full blown out legal battle. If we go that route, I will give you until Tuesday morning to decide if you are paying Systrans for the final 2 weeks (approx $ 49,000) if you decide not to remit payment immediately we will contact every consignee of each shipment via a demand letter for payment. (You can have your legal crew research transportation law which allows carriers to seek payment from any party in the transaction) I will give you the opportunity to keep this issue separate so as not to have additional impact on your customer relations.

If this does not get resolved on Monday, Tuesday morning I will engage Patton Boggs and join Tom's suit in order for the courts to resolve these issues. As you and others have stated "we are not worried about Carr" which is your opinion, however Read McCaffrey is committed to take this the entire way, and with my cooperation, notes from 67 meetings, dinners, and lunches for which 21 were for the business relationship, and 46 for the lawsuit. I'm sure my involvement will increase the chances of a fair settlement. I will also look to liquidate Systrans in order to pay the vendors, including selling the technology complete with the _data_ to any party willing to pay for such.

You told me that this is not personal, but I take it very personal given the time and commitment I gave to your agenda. In the next 72 hours you and your associates have an opportunity to settle this for everyone. Given the pattern of this relationship, I don't have a lot of confidence that you will do so, but I wanted to give you one last chance to prevent another legal battle.


Jim Neebling
President
Systrans
Phone:732-295-9914
Fax: 732-295-9980
Cell: 732-684-7868

**EXHIBIT C**



Home     Place an Order     Your Account     About Systrans     Help

**Who we are**
**Jobs**
**Privacy and
security**
**Contact us**

## Who we are

Systrans is a non-asset based third party logistics provider that uses web-based technology to coordinate and manage transportation. Systrans had developed a scalable transportation engine for rapid integration between a shippers application with their carrier's dispatch system. Systrans specializes in same day ground, same day air, LTL, and truckload.

Powered by e-Courier Software Copyright © 1999-2005, e-Courier Inc.