UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> SYSTRANS FREIGHT SYSTEMS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. 05-10999-RCL |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Iron Mountain Information Management, Inc. ("Iron Mountain"), by its attorneys, Sullivan & Worcester LLP, submits this memorandum in support of its motion for a preliminary injunction enjoining the defendant, Systrans Freight Systems, Inc. ("Systrans"), as well as its principals and agents and all others acting in concert with them who receive notice of the Court's order, from (i) disclosing, selling, transferring or otherwise disposing of Iron Mountain's confidential and proprietary information in direct violation of a written agreement between Iron Mountain and Systrans, and (ii) commencing unwarranted collection activities against Iron Mountain's customers.

Systrans' recent threats to sell Iron Mountain's confidential and proprietary information and to harass Iron Mountain's customers, made to gain leverage in a dispute between Iron Mountain and Systrans over the contractual relationship between them, both warrant and necessitate the Court's intervention. Iron Mountain is seeking an order that will preserve the status quo, protect its confidential and proprietary information, and prevent the irreparable harm,

{B0407394; 1}

injury and damage to its business and its business relationships that will certainly result if Systrans executes its threats.

## Background

### The Parties and the Contract

Iron Mountain is a wholly-owned subsidiary of Iron Mountain Incorporated (NYSE: IRM), the world's leader for outsourced records and information management services. See R. Miller Aff., ¶ 2.[1] According to its website, Systrans, based in Bay Head, New Jersey, is a non-asset based third party logistics provider that uses web-based technology to coordinate and manage transportation. See http://systrans.e-courier.com/systrans/home/index.asp (reprinted at R. Miller Aff., Exh. C). As such, Systrans is a transportation broker rather than an actual carrier or courier. Jim Neebling ("Neebling"), Systrans' President, operates and manages Systrans, and substantially all interactions between Iron Mountain and Systrans relating to the relevant events involve Neebling. See R. Miller Aff, ¶ 4.

By written agreement dated May 1, 2003 (the "Contract"), Iron Mountain and Systrans agreed, among other things, that Systrans would furnish and provide courier and related services for Iron Mountain as Iron Mountain, in its absolute discretion, might order from Systrans. See Contract, § II.A.1. (Exhibit A to R. Miller Aff.).

The Contract expressly acknowledges that Systrans will possess Iron Mountain's confidential and proprietary information while performing the Contract. See R. Miller Aff., ¶ 6; the Contract, § III.B. (Exhibit A to R. Miller Aff.). The confidential and proprietary information that Iron Mountain provided to Systrans in order for Systrans to perform its obligations under the

___
[1] "R. Miller Aff., ¶ *" refers to the Affidavit of Robert Glenn Miller, which is being filed in support of the Plaintiff's Motion for a Temporary Restraining Order.

Contract includes (i) Iron Mountain's customers' names in the districts where Systrans performed services for Iron Mountain, (ii) customer contact information (including name, address, phone numbers) in those districts, (iii) charges for deliveries to the customers in those districts, and (iv) the volume and frequency of deliveries in those districts. See R. Miller Aff., ¶ 7. Iron Mountain takes great care to maintain and protect the confidentiality of this information, which would be extremely valuable to Iron Mountain's competitors. See R. Miller Aff., ¶ 7. For example, because Iron Mountain charges its customers for each shipment of records (as does its competitors), knowing which customers have high-frequency deliveries will reveal to a competitor which of Iron Mountain's customers offer particularly lucrative opportunities if poached. See R. Miller Aff., ¶ 7.

The Contract restricts Systrans' disclosure of Iron Mountain's confidential and proprietary information except as necessary to perform the Contract. See The Contract, § III.B. (Exhibit A to R. Miller Aff). Specifically, the Contract provides:

> [Systrans] and [Iron Mountain] acknowledge that in the negotiation and performance of this Contract, confidential and proprietary information of each has been and will be made available to the other. The parties agree to use reasonable efforts to maintain the confidentiality of such material and not to make any internal use of such material not required under this Contract. Neither party will disclose the information to any third party without prior written authorization from the disclosing party, and will not use the information received by it, except to those of its employees, agents and consultants whose duties justify the need for access to the information provided that such individuals are subject to obligations or secrecy and limited use commensurate in scope with this Contract.

The Contract also requires that, upon request, Systrans return any confidential and proprietary information that it has received from Iron Mountain. See The Contract, § III.B. (Exhibit A to R. Miller Aff.) Specifically, the Contract provides in this regard:

{B0407394; 1}

>Upon written request of a disclosing party, the receiving party will return all information disclosed in written or tangible form, and the receiving party will destroy all of its copies, excerpts or notes, and files – computer, tape and paper, made by it which contain any potions of the information unless otherwise provided for by the parties.

The Contract also requires that Systrans provide certain management services related to the courier services. See R. Miller Aff., ¶ 8, the Contract, § II.A.2. (Exhibit A to R. Miller Aff.). Among other management services, the Contract requires that Systrans pay vendor invoices from courier companies that Systrans engages for performance of the Contract. See R. Miller Aff., ¶ 8, the Contract, § II.A.2. (Exhibit A to R. Miller Aff.). Since Systrans merely manages and coordinates transportation and logistics needs, Systrans' payments to the couriers (from money which Systrans receives from Iron Mountain) is critical. See R. Miller Aff., ¶ 8.

<u>Systrans' Breaches of the Contract and the May 5th Meeting</u>

Although Iron Mountain had made full and timely payments to Systrans under the Contract through mid-April, 2005, Systrans did not pay certain vendor invoices, as required by the Contract. See R. Miller Aff., ¶ 9. Systrans has acknowledged in writing that it has not paid its courier vendors performing deliveries on Iron Mountain's behalf, in multiple markets in the United States, from February through mid-April of this year despite Iron Mountain's having paid $724,675.37 to Systrans during that time. See R. Miller Aff., ¶ 9. By its own admission, Systrans owes its vendors at least $389,000 on outstanding invoices for deliveries made on Iron Mountain's behalf from February through mid-April and for which Systrans has been paid, in full, by Iron Mountain. See R. Miller Aff., 9. Systrans' failure to pay courier vendors for services which the couriers performed in making deliveries to Iron Mountain's customers has, not surprisingly, led to strains in the relationships between Iron Mountain and those couriers and

to demands for payment directly by Iron Mountain for the services which they provided under contract to Systrans. See R. Miller Aff., ¶ 9.

On May 5, 2005, representatives of Iron Mountain met with Neebling at Iron Mountain's Collegeville, Pennsylvania offices to discuss and attempt to resolve their differences, which arose largely due to Systrans' failure to pay its courier invoices (or, in one instance, Systrans' having paid an invoice with a check that was returned for insufficient funds, *i.e.*, "bounced"). See R. Miller Aff., ¶ 11. During that meeting, Neebling on behalf of Systrans again expressly acknowledged that it had not paid the vendor invoices as required by the Contract and that the amount due to its vendors for deliveries on behalf of Iron Mountain totaled more than $389,000 to that point. See R. Miller Aff., ¶ 11. Moreover, Systrans twice acknowledged **and agreed** that Iron Mountain would not be required to pay the invoices to Systrans from the weeks of April 30 and May 6, 2005, because of Systrans' failure to pay its vendors. See R. Miller Aff., ¶ 11. Instead, Systrans agreed that Iron Mountain could pay the couriers directly for services performed during those two weeks, which Iron Mountain has undertaken to do. See R. Miller Aff., ¶ 11. In other words, the parties agreed at their meeting on May 5th that Iron Mountain would only be called upon to pay these courier invoices once, directly. See R. Miller Aff., ¶ 11.

Systrans' Threats

Systrans has expressly threatened Iron Mountain that, if Iron Mountain does not pay the invoices from it to Iron Mountain for the weeks of April 30 and May 6, 2005 (which Systrans had previously acknowledged and agreed Iron Mountain would not pay), Systrans will sell Iron Mountain's confidential and proprietary information. See R. Miller Aff., ¶ 12; Neebling's May 13th email from Neebling (Exhibit B to R. Miller Aff.). Systrans has also threatened to begin sending demand letters to and pursuing collection activities against Iron Mountain's customers that had received deliveries from the couriers that Systrans contracted to furnish and provide, and

to pay for. See R. Miller Aff., ¶ 12; Neebling's May 13th email from Neebling (Exhibit B to R. Miller Aff.). Specifically, in a May 13, 2005, email received by Robert G. Miller of Iron Mountain, Systrans threatened:

> Bob
>
> * * *
>
> Since the tone of our negotiations have been far from pleasant, I want your decision on the open invoices from the final 2 weeks of business. I see no good faith in your tone, threats, and don't appreciate your comments. I feel this is leading towards a full blown out legal battle. If we go that route, I will give you until Tuesday morning to decide if you are paying Systrans for the final 2 weeks (aprox $ 49,000) if you decide not to remit payment immediately we will contact every consignee of each shipment via a demand letter for payment. (You can have your legal crew research transportation law which allows carriers to seek payment from any party in the transaction) I will give you the opportunity to keep this issue separate so as not to have additional impact on your customer relations.
>
> If this does not get resolved on Monday, Tuesday morning I will engage Patton Boggs and join Tom's suit in order for the courts to resolve these issues. As you and others have stated "we are not worried about Carr" which is your opinion, however Read McCaffrey is committed to take this the entire way, and with my cooperation, notes from 67 meetings, dinners, and lunches for which 21 were for the business relationship, and 46 for the lawsuit. I'm sure my involvement will increase the chances of a fair settlement. I will also look to liquidate Systrans in order to pay the vendors, including selling the technology complete with the <u>data</u> to any party willing to pay for such.
>
> * * *

See R. Miller Aff.; ¶ 12; Neebling's May 13th email (Exhibit B to R. Miller Aff.).

On May 17, 2005, Iron Mountain sent Neebling a letter explaining that Systrans' threats, if executed, would be a breach of the Contract. See G. Watzke Aff., ¶ 2; Watzke's May 17th letter (Exhibit A to G. Watzke Aff.). Iron Mountain further demanded that Systrans return all information that Iron Mountain has disclosed in written or tangible from, and that Systrans

-6-

destroy all of its copies, excerpts or notes, and files (including, but not limited to, computer, tape, and paper), made by it that contains any portion of the information. <u>See</u> Watzke's May 17th letter (Exhibit A to G. Watzke Aff.). Systrans, through Neebling, responded by email the same day and did not retract his threats. In fact, Neebling stated that "as for returning and destroying data and information, I will pursue the sale of our technology [including Iron Mountain's data] if we don't resolve this matter to minimize the financial downside." <u>See</u> G. Watzke Aff., ¶ 2; Neebling's May 17th email (Exhibit B to G. Watzke Aff.).

On May 18, 2005, Systrans' counsel sent a letter to Iron Mountain, in part responding to Iron Mountain's May 17th letter, and stated that "<u>at this time</u> Systrans, either through Mr. Neebling or any other entity or individual, has no intention of breaching the confidentiality provisions of the Contract or contacting customers directly." <u>See</u> G. Watzke Aff., ¶ 3; Neebling's May 17th email (Exhibit C to G. Watzke Aff.) (emphasis added). Nevertheless, the May 18th letter from Mr. Neebling's counsel did not state that Systrans would return Iron Mountain's confidential and proprietary information and Systrans has not, in fact, returned Iron Mountain's information as demanded. Furthermore, the prospect that Systrans will, at some time of its own choosing, carry out its previously asserted intention, remains a very real threat to Iron Mountain's interests.

In an effort to protect its confidential and proprietary information and to prevent Systrans from harassing its customers, Iron Mountain seeks a preliminary injunction to enjoin Systrans from executing on its threats and further breaching the Contract, to the irreparable damage to Iron Mountain.

### <u>Argument</u>

A party's request for a preliminary injunction under Fed. R. Civ. P. 65 requires consideration of four factors: (1) the party's likelihood of success on the merits; (2) the

-7-

likelihood of irreparable harm absent the injunction; (3) a comparison of this harm and any injury that the injunction would inflict on other parties; and (4) the public interest. See <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996). Iron Mountain is likely to succeed on the merits of its claims against Systrans, as those claims arise primarily from a straightforward, integrated written contract between the parties, and an injunction is necessary to preserve the status quo and prevent Systrans from executing its threats and inflicting irreparable harm on Iron Mountain.

1. <u>Iron Mountain Is Likely to Succeed on the Merits</u>

    (a)    <u>As to Iron Mountain's Confidential Information</u>

Systrans' threat to sell Iron Mountain's confidential and proprietary information, if executed, would also be a violation of the Contract. The Contract expressly prohibits Systrans' disclosure of Iron Mountain's confidential and proprietary information. There cannot be any dispute that the confidential and proprietary information that Systrans possesses is extremely valuable to Iron Mountain (or, as addressed below, that its wrongful disclosure would be damaging). Accordingly, Iron Mountain would certainly succeed on any claim for breach of contract if Systrans executes its threat.

Systrans' disclosure threat is particularly unjustified in that Systrans' refusal to return Iron Mountain's information is itself a breach of an explicit provision in the Contract. Section III.B. of the Contract, addressing confidential information, provides that upon Iron Mountain's written request, Systrans shall return any information that Iron Mountain disclosed. On May 17, 2005, Iron Mountain delivered a letter to Systrans demanding that Systrans return all information that Iron Mountain has disclosed. Systrans has failed to return the information, thus breaching the Contract. Iron Mountain will succeed on the merits of this straight-forward contractual issue.

  (b)  <u>As to Iron Mountain's Customers</u>

Systrans' threat to harass Iron Mountain's customers, by demanding to collect on invoices that Systrans agreed Iron Mountain would not pay to Systrans, is also without basis and, if carried out, would constitute tortious interference.

Systrans acknowledged and agreed that Iron Mountain would not pay the Systrans invoices from the weeks of April 30 and May 6, 2005, because Systrans had not paid its courier vendors since February 2005. Instead, the parties agreed that Iron Mountain could use the money to pay the courier vendors directly. Systrans cannot now be heard to complain that it should be paid instead. Systrans' taking of money from Iron Mountain and not paying its vendors, as it was contractually obligated to do, has effectively resulted in a misappropriation of at least $389,000 from Iron Mountain and a number of unpaid and unhappy courier vendors. It is clear why Iron Mountain is paying those vendors directly and not Systrans.

Nor does Systrans have any legal right to collect from Iron Mountain's customers. The law does not support Neebling's assertion (in his May 13th email to Robert Miller) that a consignee (*i.e.*, Iron Mountain's customer) is liable to Systrans for courier fees. See <u>Check Van Lines v. Siltek Int'l, Ltd.</u>, 404 A.2d 333 (N.J. App. Civ. 1979) (noting that many federal and state cases have recognized that a carrier may be estopped from recovering from a consignee unless the Interstate Commerce Act's policies against rate discrimination are being violated). Moreover, Systrans' status as a mere broker and not the actual carrier makes its position in this regard even more inappropriate. See <u>Jackson Rapid Delivery Service, Inc. v. Thomson Consumer Electronics, Inc.</u>, 210 F. Supp. 949, 953 (N.D. Ill. 2001) (noting that when a shipper pays the broker or freight forwarder and the payments are not sent onto the carrier, one of two innocent parties will be the loser and that the shipper should not pay again.) Here, from February through mid-April, Iron Mountain paid Systrans $724,675, which has not been

{B0407394; 1}

transmitted in any part to any carriers. Until Systrans pays its vendors for deliveries made from February through April (or Iron Mountain receives adequate assurance that Systrans has done so), Iron Mountain should not be expected to pay more money into a black hole, on pain of having its customer relationships impaired if it refuses to do so.

2. <u>Systrans' Conduct Presents an Immediate Threat of Irreparable Harm to Iron Mountain</u>

    (a)    <u>As to Iron Mountain's Confidential Information</u>

Courts act to protect a party's confidential and proprietary information because of the unique harm that results from wrongful disclosure of such information. See <u>Shipley Co. v. Kozlowski</u>, 926 F. Supp. 28, 29 (D. Mass. 1996) (noting that the plaintiff will suffer irreparable injury if the injunction is not granted because if the confidential information is allowed to be revealed, the damages will have already occurred); <u>Beals v. GM Corp.</u>, No. 85-825-WF, 1988 U.S. Distr. LEXIS 9754, *2 (D. Mass. 1988) (temporarily restraining a party from disclosing confidential information and noting that the harm of not issuing the order "would be irreparable because improper disclosure of confidential information cannot be reversed"). In this case, Systrans is threatening to sell Iron Mountain's confidential and proprietary information to the highest bidder, thus possibly disclosing the information to any number of people or entities (including Iron Mountain's competitors). There is no justification for Systrans' threat, which clearly is an effort to gain leverage in its dispute with Iron Mountain after it became clear that Systrans had not honored, and was not going to honor, its express obligations under the Contract. Clearly, since such a disclosure cannot be undone, the result will be irreparable and the injury and damage will be extremely severe.

    (b)    <u>As to Iron Mountain's Customers</u>

Systrans' threat to start contacting and harassing Iron Mountain's customers could be irreparably damaging as well. In the records and information management services (RIMS)

industry, customer service is key to survival and success. If Systrans is permitted to freely contact and harass Iron Mountain's customers when it has no basis to contact them, Iron Mountain's relationship with those customers could well be damaged and the customers may decide to find service elsewhere believing that it is better to avoid any "situation" altogether.

3. <u>The Balance of Harms and Public Interest Tips Decidedly in Favor of Iron Mountain's Requested Relief</u>

The balance of harm and public policy weigh heavily in favor of granting an injunction in this case to preserve the status quo and prevent irreparable harm to Iron Mountain. The injunction will simply enjoin Systrans from doing things it has no legal right to do. This cannot be a harm such that will prevent an injunction. On the other hand, without an injunction, Systrans will likely execute its threat and Iron Mountain will suffer irreparable harm. To the extent that there are any public interest implications, they can only be served by protection of Iron Mountain's confidential and proprietary information and enforcement of Systrans' clear contractual obligations.

## Conclusion

For the foregoing reasons, Iron Mountain states that its motion for a preliminary injunction should be granted.

Respectfully submitted,

**IRON MOUNTAIN INFORMATION MANAGEMENT, INC.**

By its attorneys,

May 20, 2005

/s/ Samual A. Miller
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 20th day of May, 2005, served on counsel listed below, by email and FedEx, a true and correct copy of the foregoing **Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction**.

Read K. McCaffrey, Esq.
Patton Boggs LLP
2550 M Street, NW
Washington, DC  20037

/s/ Samual A. Miller
Samual A. Miller

{B0407394; 1}