UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT INC. . <br><br> Plaintiff <br> and Defendant-in-Counterclaim <br><br> v. <br> SYSTRANS FREIGHT SYSTEMS, INC <br><br> Defendant and <br> Plaintiff-in-Counterclaim | CIVIL ACTION NO. 05-10999-MLW |

**DEFENDANT AND COUNTER-PLAINTIFF'S ANSWER TO PLAINTIFF'S AND COUNTER-DEFENDANT'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTER-CLAIMS**

Defendant and Counter-Plaintiff Systrans Freight Systems, Inc. ("Systrans") by its attorneys Kathleen Stone of Looney, Cohen, Reagan & Aisenberg LLP and Read McCaffrey of Patton Boggs, LLP, herewith Answers Plaintiff's First Amended Complaint and states:

### Nature of the Action

1. Systrans DENIES the allegations in Paragraph 1.

### Parties

2. Systrans ADMITS the allegations in Paragraph 2.

3. Systrans ADMITS the allegations in Paragraph 3.

## Jurisdiction and Venue

4. Systrans ADMITS the allegations in Paragraph 4.

5. Systrans ADMITS that venue is proper in this Court as alleged in Paragraph 5.

## Background

6. Systrans DENIES the allegations in Paragraph 6, and notes the contract speaks for itself.

7. Systrans ADMITS the allegations in Paragraph 7.

8. Systrans DENIES the allegations in Paragraph 8, and notes the contract speaks for itself.

9. Systrans ADMITS only that the Contract states at II.A.2, "Contractor will provide the following management services to Iron Mountain . . . Payment of all vendor invoices associated with vendors."

10. Systrans ADMITS that certain vendor invoices have not been paid from courier companies used for performance of the contract. Systrans notes that the contract speaks for itself. Systrans DENIES the remaining allegations of Paragraph 10

11. Systrans ADMITS that the first sentence of Paragraph 11 appears to summarize the contents of a May 2, 2005 letter from Plaintiff signed by Gary Watske, but Systrans denies received a letter of April 26, 2005. Systrans DENIES the allegations in the second sentence of Paragraph 11.

12. Systrans has insufficient information to either admit or deny the first sentence of Paragraph 12. Systrans DENIES the allegation in the second sentence.

13. Systrans ADMITS the allegations in Paragraph 13.

14. Systrans has insufficient information to either admit or deny the allegations in Paragraph 14.

15. Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 15.

16. Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 16.

17. Systrans DENIES the allegations in Paragraph 17. An error was discovered in the program by Systrans. Systrans disclosed this error to Iron Mountain and Systrans, at its own cost, retained an expert to calculate any excess charges that may have been applied. Their charges were expressly agreed to by Iron Mountain and Systrans and by further agreement were added to the loan balance.

18. Systrans DENIES the addenda but admits that a balance of approximately $150,000 is owed.

19. Systrans DENIES Plaintiffs' characterizations in Paragraph 19and admit only that the contract speaks for itself.

20. Systrans lacks sufficient information to either admit or deny the allegations in Paragraph 20.

21. Systrans admits only that the contract speaks for itself.

22. Systrans DENIES the allegations in Paragraph 22.

23. Systrans admits only that the May 17, 2005 letter speaks for itself.

24. Systrans DENIES the allegations in Paragraph 24.

3869089v2

25. Systrans ADMITS that a portion of the May 18, 2005 letter from counsel is accurately quoted. The entire letter appears as Exhibit C to Iron Mountain's Motion for Preliminary Injunction, now being withdrawn.

### Count I

26. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-26 as is set forth fully herein.

27. Systrans asserts that the contract speaks for itself, and the remaining allegations contain legal conclusions to which no responsive pleading is required.

28. Systrans DENIES the allegations in Paragraph 28.

29. Systrans DENIES the allegations in Paragraph 29.

30. Systrans DENIES the allegations in Paragraph 28. Further, Systrans contends the allegations state a legal conclusion for which no responsive pleading is required.

### Count II

31. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-30 as is set forth fully herein.

32. Systrans contends that the contract speaks for itself.

33. Systrans DENIES the allegations in Paragraph 33.

34. Systrans DENIES the allegations in Paragraph 34. Further, Systrans had agreed with Plaintiff to a payment plan for the monies allegedly owed and Systrans was current on this plan at the time Plaintiff sued Systrans.

4

35. Systrans DENIES the allegations in Paragraph 35.

36. Systrans DENIES the allegations in Paragraph 36.

## **Count III**

37. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-38 as is set forth fully herein.

38. Systrans DENIES the characterizations of the contract in Paragraph 29 and admits only that the contract speaks for itself.

39. Systrans DENIES the allegations in Paragraph 39.

40. Systrans DENIES the allegations in Paragraph 40.

41. Systrans DENIES the allegations in Paragraph 41.

## **Count IV**

42. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-41 as is set forth fully herein.

43. Systrans DENIES the allegations in Paragraph 43.

44. Systrans DENIES the allegations in Paragraph 44.

45. Systrans DENIES the allegations in Paragraph 45.

46. Systrans DENIES the allegations in Paragraph 46.

### Count V

47. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-46 as is set forth fully herein.

48. Systrans DENIES the allegations in Paragraph 48.

49. Systrans DENIES the allegations in Paragraph 49.

50. Systrans DENIES the allegations in Paragraph 50.

51. Systrans DENIES the allegations in Paragraph 51.

### Count VI

52. Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-52 as is set forth fully herein.

53. Systrans DENIES the allegations in Paragraph 53.

54. Systrans DENIES the allegations in Paragraph 54.

55. Systrans DENIES the allegations in Paragraph 55.

56. Systrans DENIES the allegations in Paragraph 56.

### DEFENDANT'S AND COUNTER-PLAINTIFFS'S AFFIRMATIVE DEFENSES

And for its Affirmative Defenses to Plaintiff's First Amended Complaint, Systrans avers:

1. Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have personal jurisdiction over the Defendant.

2. Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have subject jurisdiction over the dispute.

3.  The relief sought by the Plaintiff is barred by the doctrine of Unclean Hands.

4.  Plaintiff has failed to state a claim upon which relief can be granted.

5.  Plaintiff has failed to join parties indispensable pursuant to Rule 19.

6.  Plaintiff's claims are barred by estoppel.

7.  Plaintiff's Complaint is frivolous and otherwise violates Rule 11.

8.  Certain of Plaintiff's claims have been mooted by Court order.

9.  Defendant and Counter-Plaintiff reserve its right to assert additional defenses as discovery in these proceedings may support.

## COUNTER-CLAIMS

Defendant and Counter-Plaintiff Systrans, by its undersigned counsel, brings this action against the Plaintiff and Counter-Defendant Iron Mountain, and states:

### Nature of Action

1.  Prior to January 2001, Iron Mountain Incorporated merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain ("Iron Mountain"). At all times relevant to this Counter-Claim, Iron Mountain, as a result of its acquisition of Pierce Leahy, was one of the world's leading document retention and storage companies in the world worth almost $4 billion. Iron Mountain employs approximately 15,000 people. To be sure, no company in the United States comes close to being able to directly compete with Iron Mountain's dominance in this industry.

2. Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3. Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4. Upon information and belief, Pierce had signed a "non-compete" agreement as part of the aforementioned commercial transaction.

5. On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6. In the months following the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex that, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

7. At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of Pierce's non-compete agreement), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8. The proceedings described in Paragraph 7 are currently on appeal. However, it is believed that Iron Mountain has recently reimbursed Pierce between $1 million and $2 million for Pierce's counsel fees as a result of Pierce prevailing in the arbitration.

9. One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain at one of the many warehouses Iron Mountain acquired from Pierce Leahy.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Gary Watzke, Iron Mountain's General Counsel, that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain. Carr protested in writing to Watzke.

11. In August 2001 a senior 'entourage' from Iron Mountain, including its President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny), came to New Jersey and met with Carr and revealed at that time, for the first time, their true agenda: a discussion of what they believed were unlawful acts being committed by Pierce.

12. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Carr would assist Iron Mountain in confirming what it already suspected about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate Carr in various ways which they, Iron Mountain, were confident Carr would find acceptable.

13. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup some or all of the $1.2 billion Iron Mountain paid to acquire of Pierce's company.

14. Thereafter, a series of meetings transpired among Iron Mountain, its agents (see Paragraph 15) and Carr, his counsel Arthur Peslak, and Carr's friend James Neebling, principal of Counter-Plaintiff, Systrans Freight, Inc., (hereinafter "Systrans"). While literally scores of conversations occurred among these parties over a two and half year period the more notable meetings or conversations occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York. To be clear, the meetings and conversations between the parties occurred with the active participation of Iron Mountain's Chairman and Chief Executive Officer (Richard Reece), President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny) as well as Iron Mountain's agents, as described in Paragraph 15.

15. Also involved in these meetings and negotiations on behalf of Iron Mountain were its outside counsel, the law firms of Sullivan and Worcester and Morgan Lewis. Attorneys Larry Varn, Samuel Miller, William Matlock, and Beth Jacobson, were all either partners or associates of Sullivan and Worcester, acting on behalf of Sullivan and Worcester, and had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Attorney Doreen Davis, a partner of Morgan Lewis, acting on behalf of Morgan Lewis, had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Iron Mountain and/or Sullivan and Worcester retained Charlie Moore to serve as the primary liaison with Carr and Systrans. (Collectively, the attorneys and law firms of Sullivan and

3869089v2

Worcester and Morgan Lewis and Charlie Moore are referred to as Iron Mountain's "agents".)

16. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included Iron Mountain and its agents on the one hand, and Carr, Peslak and Systrans, on the other hand, Iron Mountain stated that in consideration for Carr and Neebling providing information and cooperation in the Pierce arbitration, Iron Mountain and one or more of its agents promised Carr and Systrans, *inter alia*, that Systrans would receive nearly $45 Million per year in transportation courier management business for five years.

17. In comparison with Iron Mountain's $4 billion value and nearly 15,000 employees, Systrans was a small business worth less than $1 million and employed less than 15 people. Iron Mountain's business model required it to rely heavily on vendors at an enormous expense and loss of efficiency. In reliance on Iron Mountain's promises, Systrans created software that was specifically designed to effectively to manage third party courier and transportation services for Iron Mountain. Neebling, on behalf of Systrans, purchased hundreds of thousands of dollars of computer software and hardware systems and devoted two and half years of work evaluating Iron Mountain's systems and creating software and technologies that have proven to save Iron Mountain millions in unnecessary expenses and efficiencies. Systrans' software and technology was therefore designed and capable of handling the $45 million in business that Iron Mountain repeatedly promised would be forth coming.

18. As part of Neebling's comprehensive analysis of Iron Mountain's transportation and courier systems he uncovered and disclosed to Iron Mountain massive problems with Iron Mountain's management of these systems. Neebling discovered and disclosed to Iron

3869089v2

Mountain: serious violations of Department of Transportation regulations, security clearance violations for courier drivers, incompetent and improperly trained courier drivers (both in-house and third party), incorrectly licensed motor vehicles, failure to comply with insurance regulations for commercial liability, failure to comply with Workers Compensations regulations, and failure to have comprehensive standard operating procedures for drivers that would preclude the chance for loss of theft of information being transported. Discovering and remedying these deficiencies were part of the scope of work that Systrans was to perform, but Iron Mountain refused to allow Systrans to fix these massive internal problems or create a mechanism for Iron Mountain to remedy these deficiencies.

19. During a meeting in 2002, Iron Mountain's CFO, Kenny, told Neebling that Iron Mountain annually incurs well over $125 million in expenses for courier and transportation services. At all times relevant to this Counter-Claim Iron Mountain's representations to Systrans regarding their contract were made based upon Iron Mountain's superior knowledge of its own courier needs and internal business strategies. Separately, Iron Mountain's representations to Systrans regarding its repeatedly stated promise to provide Systrans with $45 million in annual business for five years were made with Iron Mountains' recognition that its decision to honor its promises to Systrans were within Iron Mountain's sole discretion and/or exclusive control.

20. Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce to coincide with the action that Iron Mountain was planning to also file against Pierce. With the intent of orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

21. On March 26, 2002, Carr and Neebling met with Iron Mountain's Chairman and CEO (Reece), CFO (Kenny), and General Counsel (Watzke) at Iron Mountain's corporate headquarters in Boston, Massachusetts. Acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and promised Neebling to provide $25 million in courier business to Systrans. During that same conversation, Kenny revised the amount of courier business Iron Mountain would provide to Systrans. Kenny stated, in the presence of Reese and Watzke, that revenues of more than $45 Million would be paid to Systrans each year for a period of five years in return for the cooperation of Carr and Neebling (Systrans) as described above.

22. On April 9, 2002 in a private restaurant room in New York, New York, Carr, Neebling and Peslak met with Varn, Reese and Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

23. Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

24. As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition,

13

Kenny reiterated that in exchange for Neebling and Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

25. In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her, which occurred in April of 2002. Kenny called Mrs. Carr while she and her family were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

26. Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce. Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California. Carr signed the complaint and Iron Mountain coordinated the filing of the action.

27. During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendant by meeting with witnesses, reviewing and investigating commercial transactions involving Pierce and Pierce-related companies, and turning over documents and other materials to the Counter-Defendant and/or its agents. This cooperation involved extensive travel at the request of several of the Counter-Defendant and its agents. Among those to whom Systrans provided the aforementioned information and cooperation were, in part, Varn, Miller, Davis, Watzke, and Moore. Indeed, Varn, Miller,

Davis and Moore met with Neebling and reviewed key testimony and evidence regarding the Pierce arbitration. Varn and Miller, on behalf of Sullivan and Worcester, shared pleadings and depositions from the arbitration with Neebling and asked for Neebling's analysis of the pleadings and testimony.

28. In direct and full reliance on the aforementioned promises of consideration, Neebling continued to cooperate with the Counter-Defendant, as they had requested and, as a result of his reliance on behalf of Systrans, has virtually lost the entire Systrans businesses as a result of Iron Mountain's failure to provide Systrans with the nearly $45 million in revenue for five years as it had promised.

29. While Iron Mountain repeatedly promised Systrans that it would provide Systrans with $45 million in revenue for five years for its courier management technology services, Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans this level of business. Iron Mountain's representations were false at the time they were made and were designed merely to ensure Neebling and Carr's cooperation in Iron Mountain's prosecution of its arbitration action against Pierce. Once Iron Mountain decisively lost the arbitration and was forced to pay Pierce's cost to defend himself, Iron Mountain promptly turned on Systrans and Neebling and began to systematically strangle Systrans economically by not providing it with enough revenue to survive.

30. In approximately September 2003, Carr and Neebling attended a meeting with Varn and Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within

15

the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

31. All of the aforementioned contractual obligations and promises, which the Counter-Defendant presented to Neebling on behalf of Systrans, were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

32. Despite repeated requests from Carr, his New Jersey counsel Peslak as well as his Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants refused to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

**Count I**

**Breach of Contract**

33. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 32 as if repeated herein.

34. The transactions as between Iron Mountain and Systrans do constitute a binding oral contract supported by adequate consideration.

35. Systrans has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

36. Iron Mountain failed to perform its promises and obligations pursuant to the aforementioned oral contract as described above, which does constitute a material breach of said oral contract.

37. As the direct and proximate result of the aforementioned material breach of contract by the Counter-defendant, Systrans has been damaged.

38. WHEREFORE, the Counter-Plaintiff Systrans demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

## Count II

## Negligent Misrepresentation

39. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 38 as if repeated herein.

40. Iron Mountain repeatedly promised Systrans, through its owner, that it would direct to the company $45 million in revenue for five years, in exchange for Neebling's information and cooperation in prosecuting the Pierce arbitration, as more fully described in paragraph 21.

41. Iron Mountain received from Neebling critical information known to Neebling, which information was sought by the Counter-Defendant in the prosecution of its claims against Pierce. Moreover, Iron Mountain gained Neebling's complete cooperation in assisting Iron Mountain in filing a separate action against Pierce.

42. At the time the representations set forth in Paragraph 40 were made to Neebling, the Counter-Defendant, had superior knowledge, recognized that the ability and decision to honor its contract with Systrans was in its sole discretion and/or its exclusive control, and/or that at the time the statements were made Iron Mountain did not intend to honor its promises, making the statements to Systrans false when they were made.

3869089v2

43. That, as more fully explained above, Systrans did in fact rely on the aforementioned false statements, not knowing them to be false, to its detriment in that Systrans invested money, and effort in developing technology specifically for Iron Mountain and Iron Mountain's false representations caused Systrans to suffer massive business losses and effectively, the business itself.

44. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' negligent misrepresentations, Systrans has been damaged.

WHEREFORE, Systrans demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

SYSTRANS DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

By its attorneys,

        **/S/ Stone**
Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
(617) 371-1050

Read K. McCaffrey
Christopher W. Hellmich
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243