## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENTM INC. <br><br> Plaintiff <br><br> v. <br><br> SYSTRANS FREIGHT SYSTEMS, INC. <br><br> Defendant <br><br> AND <br><br> SYSTRANS FREIGHT SYSTEMS, INC. <br><br> Counter-Plaintiff, <br><br> v. <br> IRON MOUNTAIN INFORMATION MANAGEMENTM INC. <br><br> Counter-Defendant. | CIVIL ACTION NO. 05-10999-RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S MOTION TO CONSOLIDATE

Systrans Freight Systems, Inc. ("Systrans"), Defendant and Counter-Plaintiff, by and through undersigned counsel, pursuant to FED.R.CIV.P. 42, respectfully moves that the above-captioned action be consolidated with a substantially related and previously filed case also pending before this Court styled *Iron Mountain et al. v. Thomas Carr.* Civil Action No. 05-10890- RCL (the "Carr Action").

Iron Mountain opposes this motion.

1

Counsel for Systrans Freight Systems, Inc., are also counsel for Mr. Thomas Carr, the defendant and counter-plaintiff in the Carr Action, and represent that Carr consents to consolidation of his case. The Carr Action is currently engaged in hotly contested motion practice. Earlier today, Carr filed a motion to consolidate this matter along with the case filed by Iron Mountain against him. As of the date of this filing, no motion practice has been instituted in this matter.

Systrans respectfully joins the motion to consolidate this action with the Carr Action and asks that this Court consent to the motion to consolidate.

A copy of the Carr's motion to consolidate and the memorandum in support of that motion are attached herewith. Exhibit A.

July 11, 2005

Respectfully submitted,

By his attorneys,

Kathleen C. Stone
BBO # 481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

Read K. McCaffrey
Christopher W. Hellmich
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243

2

CERTIFICATE OF SERVICE

I hereby certify that true copies of Defendant and Counter-Plaintiff's Motion to Consolidate, Memorandum in support thereof and proposed order were mailed, postage prepaid, this 11th day of July, 2005 to counsel for the plaintiffs herein, Ira K. Gross, Esq. Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts, 02109.

_____
Luci Morgan

3877633v1

Iron Mountain v. Systrans & Systrans v. Iron Mountain
Civil Action No. 05-10999 RCL
U.S.D.C. Massachusetts

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>THOMAS CARR, )<br><br>Defendant )<br><br>And )<br><br>THOMAS CARR, )<br><br>Counter-Plaintiff )<br><br>v. )<br><br>IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, )<br><br>Counter-Defendants ) | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S MOTION TO CONSOLIDATE

Thomas Carr, Defendant and Counter-Plaintiff, by and through undersigned counsel, pursuant to FED.R.CIV.P. 42, respectfully moves that the above-captioned action be consolidated with a substantially related case also pending before this Court styled *Iron Mountain Information Management, Inc. v. Systrans Freight Systems, Inc.* Civil Action No. 05-10999-MLF.

1

Plaintiffs oppose this motion.

Counsel for Carr are also counsel for Systrans Freight Systems, Inc., and represent that Systrans Freight Systems, Inc. consents to consolidation of its case before Your Honor.

A memorandum in support of this motion and proposed order are attached herewith.

July 11, 2005

Respectfully submitted,

By his attorneys,

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050


Read K. McCaffrey
Christopher W. Hellmich
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com

2

CERTIFICATE OF SERVICE

I hereby certify that true copies of Defendant and Counter-Plaintiff's Motion to Consolidate, Memorandum in support thereof and proposed order were mailed, postage prepaid, this 11th day of July, 2005 to counsel for the plaintiffs herein, Ira K. Gross, Esq. Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts, 02109.

_Luci Morgan_
Luci Morgan

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IRON MOUNTAIN INCORPORATED; et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THOMAS CARR, | ) ) ) | |
| Defendant | ) ) | Civil Action No. |
| And | ) ) | |
| THOMAS CARR, | ) ) | 05 10890 RCL |
| Counter-Plaintiff | ) ) ) | |
| v. | ) ) | |
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, | ) ) ) ) ) ) ) ) | |
| Counter-Defendants | ) ) | |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION TO CONSOLIDATE

### INTRODUCTION

Scarcely fewer cases could be riper for consolidation than the tandem lawsuits

filed by lead Plaintiff, Iron Mountain, against Tommy Carr and Systrans Freight Systems,

Inc. The primary issue in both of Iron Mountain's cases involves a series of promises

Iron Mountain and the plaintiffs (in this case) made to both Tommy Carr and Jim Neebling, the principal owner of Systrans. Every factual issue to be explored in the Systrans case will also be central to resolution of the contractual dispute in this case. Conversely, the promises made by each of the plaintiffs in this case will be thoroughly explored and necessarily integral to resolution of the Systrans case.

In fairness to the Court, it would not have been possible by reading Iron Mountain's complaints to glean that its cases regard identical subject matters and involve all of the very same witness. Indeed, Iron Mountain indicated that the Systrans case was 'related' to this action, but now curiously opposes consolidation. Perhaps a tactical advantage may be gained in suing these two individuals – Iron Mountain has essentially forced Systrans out of business leaving its principal owner, Jimmy Neebling to defend the Systrans action – in separate courtrooms of the same courthouse. A cursory review of the counterclaims filed in both actions, though, confirms with little doubt that Iron Mountain's cases are inextricably intertwined.

It goes without saying that judicial economy, efficiency in litigation for the parties, and the tangible risk inconsistent verdicts in separate cases regarding the very same subject matter auger strongly in favor of consolidation.

### FACTUAL SUMMARY

Iron Mountain's litgation against Carr and Systrans stem from a vitriolic lawsuit Iron Mountain lost against its former president, Peter Pierce. Before becoming president of Iron Mountain Pierce owned Iron Mountain's principal competitor, Pierce Leahy. When the companies merged Iron Mountain became the largest document storage and retrieval business in the United States, and arguably the world, generating billions in

3877365v2

revenue annually. As part of the merger Pierce became the president of this newly combined monolith yet he was only able to hold onto the job for six months before being summarily fired. Iron Mountain's lawsuit against Pierce alleged that Pierce retaliated for being fired by starting a business called Squedex designed to compete with Iron Mountain. If true, Pierce would have violated a key term of the merger, and on information and belief, entitling Iron Mountain to demand the return of some portion of the $1 billion it paid for Pierce Leahy.

In its vigorous pursuit to prove Pierce violated his non-compete agreement, the plaintiffs in this case sought out both Tommy Carr and Jimmy Neebling, principal owner of Systrans. The plaintiffs believed that Carr and Neebling could help Iron Mountain's litigation and investigatory team assemble proof that Pierce violated his agreement and was competing against Iron Mountain.

Through a series of meetings in which each of the plaintiffs met with Carr and Neebling they promised both Carr and Neebling cash and contracts for Neebling's company Systrans in exchange for their assistance in preparing for their trial against Pierce. The meetings were well documented, and from time to time, included Carr and Neebling's attorney, Art Peslak. Mr. Peslak, a well-respected New Jersey attorney who is completely disinterested in this dispute, is prepared to testify that he personally met with the plaintiffs and confirmed the promises they made to both Carr and Neebling. Indeed, Iron Mountain's law firm Sullivan and Worcester paid Peslak $50,000 in furtherance of these discussions.

It is no coincidence that the counterclaims filed by both Carr and Systrans are nearly verbatim in their recitation of factual allegations in support of their counterclaims.

4

All of the witnesses called to testify in support of Carr's counterclaims will be called in

the Systrans action to testify to the very same events, and these same people will also be

called in the Systrans action to testify as to events in the Carr matter.

### ARGUMENT

It is well established that this Court has broad discretion in consolidating related

actions in the interest of efficiency and economy. *See, e.g., Seguro de Servicio de Salud*

*de Puerto Rico v. McAuto Systems Group, Inc.*, 878 F.2d 5, 8 (1st Cir. 1989); *In re PRI*

*Automation, Inc. Securities Litigation*, 145 F. Supp. 2d 138, 140 (D. Mass. 2001).

Consolidation of this action with the related *Systrans* case represents an appropriate

exercise of such discretion.

In this jurisdiction, an analysis under Rule 42 is guided by a two-part inquiry.

In determining whether to order consolidation, the court must first
determine whether the two proceedings involve a common party and
common issues of fact or law. Once this determination has been made, the
court has "broad discretion in weighing the costs and benefits of
consolidation to decide whether that procedure is appropriate."

*In re PRI Automation, Inc. Securities Litigation*, 145 F. Supp. 2d at 140 (quoting *Seguro*

*de Servicio de Salud de Puerto Rico*, 878 F.2d at 8). "In considering the costs and

benefits of consolidation, it is appropriate to consider and weigh the convenience or

inconvenience of the parties, the judicial economy, the savings in time, effort or expense

and 'any confusion, delay or prejudice that might result from consolidation.'" *Gilliam v.*

*Fidelity Management & Research Co.*, No. Civ. 04-11600NG, 2005 WL 1288105 (D.

Mass. May 3, 2005)(quoting *Data Central Corp. v. Grumman Sys. Support Corp.*, 834 F.

Supp. 477, 487 (D. Mass. 1992)).

Further guidance is provided by the Court's Local Rules. Local Rule 40.1(g)

provides in pertinent part:

3877365v2

...a civil case is related to one previously filed in this court if some or all of the parties are the same and if one or more of the following similarities exist also: the cases involve the same or similar claims or defenses; or the cases involve the same property, transaction or event...or the cases involve substantially the same questions of fact and law.

L.R. 40.1(g)

### 1.    Common Parties Exist in Both Cases.

Even a cursory review of the counterclaims in these two actions, demonstrates clear overlap of parties in both of Iron Mountain's cases. To their credit, Iron Mountain recognized that the cases were related and indicated as much by acknowledging this in Section VII of the civil cover sheet of their lawsuit against Systrans. Exhibit 1. By indicating that the cases are related plaintiffs admit, at a minimum, that the first prong of the test for consolidation has been met.

While Iron Mountain is the only party that appears in both actions, all of the parties in this case are material witnesses in the Systrans action. *See generally*, Exhibit 2, Defendant and Counter-Plaintiff Systrans Freight Systems, Inc's Answer and Counterclaims, Counterclaim ¶¶ 14 through 17.

Conversely, Neebling and Systrans were the unnamed entities in Iron Mountain's complaint against Carr. *See*, Exhibits 3, Compl. ¶17 ("...Carr claims that there was a March 26, 2002 meeting at Iron Mountain's corporate headquarters...among Carr, Kenny, Reese, Watske, and other individuals not name in this complaint.") Systrans is unmistakably the "other individual" to whom Iron Mountain referred to in the following sentence of its complaint. ("Carr claims that during this March 26, 2002 meeting Iron Mountain promised 'to hire Carr as transportation consultant and to provide $25 million in courier business to Carr' and another individual") *Id.*

6

2.    Iron Mountain's Cases Involve The Same Questions of Fact and Law.

Iron Mountain's action for declaratory judgment plainly speaks to the overlapping issues of fact and law that inextricably intertwine both of its lawsuits. The counterclaims filed in response to Iron Mountain's lawsuits makes the point even clearer. *Compare*, Exhibit 2, Counterclaim ¶¶ 1 through 32 *with* Exhibit 4, Defendant's and Counter-Plaintiff's Second Amended Counter-Claim ¶¶ 1 through 44.

First, both cases as pled by Iron Mountain plainly involve the same meetings, participants and financial transactions. And, the legal issues at stake in both cases are identical. Iron Mountain's complaint against Carr seeks to declare that it does not owe Systrans $25 million of business. *See* Exh. 3, ¶17. Clearly, summary adjudication of this claim would impact the Systrans' case running the risk of inconsistent verdicts.

In the same vein, the *Systrans* case centers on the respective contractual obligations of Systrans and Iron Mountain as they involved negotiations including Mr. Carr, the subject of his counterclaims. In sum, the financial and contractual obligations between Systrans and Iron Mountain are central to both actions. Accordingly, there is clear overlap between these two cases of both factual and legal issues concerning the nature and extent of the parties' respective obligations.

3.    Judicial Economy and Efficiency for Litigants Favor Consolidation.

While the local rules do not explicitly factor in the impact of judicial economy on consolidation, it is a factor in Rule 42. There is little doubt that with as much overlap as exists in these two cases that significant savings in time and money will be achieved by the court and the parties through consolidation.

7

The cost of defending the lawsuits that Iron Mountain has brought is falling on individuals, Tommy Carr and Jimmy Neebling. They both strongly favor consolidation of these suits and anticipate that the economic savings of consolidation will be significant.

    4.    <u>Presumption In Favor Of Consolidation.</u>

Notwithstanding Iron Mountain's opposition to consolidation, a presumption exists in favor of consolidating cases like this. Indeed, the threshold for successfully opposing consolidation is quite high. "A motion for consolidation <u>will usually be granted</u> unless the party opposing it can show 'demonstrable prejudice.'" *Seguro de Servicio de Salud de Puerto Rico*, 878 F.2d at 8 (citation omitted) (emphasis added). *See also In re PRI Automation, Inc. Securities Litigation*, 145 F. Supp. 2d at 140 ("If those first two steps are resolved in favor of consolidation, the motion to consolidate ordinarily will be granted unless the opposing party shows 'demonstrable prejudice.'"); *Gilliam v. Fidelity Management & Research Co.*, 2005 WL 1288105 *1 ("Absent 'demonstrable prejudice,' consolidation is generally allowed.").

Iron Mountain's tactical opposition to consolidation simply does not rise to the level of demonstrable prejudice that would preclude the efficient consolidation of these cases.

3877365v2

## CONCLUSION

WHEREFORE, for all of the reasons stated above, counter-plaintiff Carr moves

for the consolidation of the above-captioned action with related case also pending before

this Court styled *Iron Mountain Information Management, Inc. v. Systrans Freight*

*Systems, Inc.* Civil Action No. 05-10999-MLW.


July 11, 2005


                                  Respectfully submitted,

                                  By his attorneys,


                                  Kathleen C. Stone
                                  BBO #481920
                                  Looney, Cohen, Reagan & Aisenberg LLP
                                  109 State Street
                                  Boston, MA 02109
                                  617-371-1050


                                  Read K. McCaffrey
                                  Christopher W. Hellmich
                                  PATTON BOGGS, LLP
                                  2550 M Street, NW
                                  Washington, DC 20005
                                  (202) 457-5243
                                  rmcccaffrey@pattonboggs.com

3877365v2

Iron Mountain, et al. v. Carr & Carr v. Iron Mountain, et al.
Civil Action No. 05-10890 RCL
U.S.D.C. Massachusetts

# Exhibit 1

%JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Iron Mountain Information Management, Inc. | Systrans Freight Systems, Inc. |

**(b)**  County of Residence of First Listed Plaintiff  Montgomery County, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)
Ira K. Gross and Samuel A. Miller, Sullivan & Worcester LLP, One Post
Office Square, Boston, MA 02109  Tel: (617) 338-2800

Attorneys (If Known)

05  10999 RCL

## II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V.  ORIGIN   (Place an "X" in One Box Only)

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332
Brief description of cause:
Breach of written agreement, including failure to provide/procure services and failure to make certain payments

## VII.  REQUESTED IN   COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $  in excess of $ 166,700.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII.  RELATED CASE(S)   IF ANY

(See instructions):   JUDGE  Reginald C. Lindsay    DOCKET NUMBER  05-10890 RCL

DATE
5-13-05

SIGNATURE OF ATTORNEY OF RECORD
Samuel A. Mill

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)___Iron Mountain Information Management, Inc. v. Systrans Freight
Systems, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local
rule 40.1(a)(1)).

☐ I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
        740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

☑ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
        315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
        380, 385, 450, 891.

☐ IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
        690, 810, 861-865, 870, 871, 875, 900.

☐ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this
district please indicate the title and number of the first filed case in this court.
   Iron Mountain Incorporated, et al. v. Thomas Carr, U.S.D.C., D. Mass., Civil Action No. 05 10890 RCL

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                        YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
   §2403)
                                                        YES ☐    NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                        YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                        YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                        YES ☐    NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division ☐          Central Division ☐          Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
         residing in Massachusetts reside?

         Eastern Division ☐          Central Division ☐          Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
   submit a separate sheet identifying the motions)
                                                        YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___Ira K. Gross and Samual A. Miller, Sullivan & Worcester LLP
ADDRESS ___One Post Office Square, Boston, MA 02109
TELEPHONE NO. ___(617) 338-2800

(CategoryForm.wpd - 5/2/05)

Iron Mountain, et al. v. Carr & Carr v. Iron Mountain, et al.
Civil Action No. 05-10890 RCL
U.S.D.C. Massachusetts

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT INC. <br><br> Plaintiff <br> and Defendant-in-Counterclaim <br><br><br> v. <br> SYSTRANS FREIGHT SYSTEMS, INC <br><br><br> Defendant and <br> Plaintiff-in-Counterclaim | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO. 05-10999-MLW

**DEFENDANT AND COUNTER-PLAINTIFF'S ANSWER TO PLAINTIFF'S AND COUNTER-DEFENDANT'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTER-CLAIMS**

Defendant and Counter-Plaintiff Systrans Freight Systems, Inc. ("Systrans") by its attorneys

Kathleen Stone of Looney, Cohen, Reagan & Aisenberg LLP and Read McCaffrey of Patton Boggs,

LLP, herewith Answers Plaintiff's First Amended Complaint and states:

### Nature of the Action

1.    Systrans DENIES the allegations in Paragraph 1.

### Parties

2.    Systrans ADMITS the allegations in Paragraph 2.

3.    Systrans ADMITS the allegations in Paragraph 3.

1

**Jurisdiction and Venue**

4.    Systrans ADMITS the allegations in Paragraph 4.

5.    Systrans ADMITS that venue is proper in this Court as alleged in Paragraph 5.

**Background**

6.    Systrans DENIES the allegations in Paragraph 6, and notes the contract speaks for itself.

7.    Systrans ADMITS the allegations in Paragraph 7.

8.    Systrans DENIES the allegations in Paragraph 8, and notes the contract speaks for itself.

9.    Systrans ADMITS only that the Contract states at II.A.2, "Contractor will provide the following management services to Iron Mountain . . . Payment of all vendor invoices associated with vendors."

10.    Systrans ADMITS that certain vendor invoices have not been paid from courier companies used for performance of the contract.  Systrans notes that the contract speaks for itself. Systrans DENIES the remaining allegations of Paragraph 10

11.    Systrans ADMITS that the first sentence of Paragraph 11 appears to summarize the contents of a May 2, 2005 letter from Plaintiff signed by Gary Watske, but Systrans denies received a letter of April 26, 2005.  Systrans DENIES the allegations in the second sentence of Paragraph 11.

12.    Systrans has insufficient information to either admit or deny the first sentence of Paragraph 12.  Systrans DENIES the allegation in the second sentence.

13.    Systrans ADMITS the allegations in Paragraph 13.

2

14. Systrans has insufficient information to either admit or deny the allegations in Paragraph 14.

15. Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 15.

16. Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 16.

17. Systrans DENIES the allegations in Paragraph 17. An error was discovered in the program by Systrans. Systrans disclosed this error to Iron Mountain and Systrans, at its own cost, retained an expert to calculate any excess charges that may have been applied. Their charges were expressly agreed to by Iron Mountain and Systrans and by further agreement were added to the loan balance.

18. Systrans DENIES the addenda but admits that a balance of approximately $150,000 is owed.

19. Systrans DENIES Plaintiffs' characterizations in Paragraph 19and admit only that the contract speaks for itself.

20. Systrans lacks sufficient information to either admit or deny the allegations in Paragraph 20.

21. Systrans admits only that the contract speaks for itself.

22. Systrans DENIES the allegations in Paragraph 22.

23. Systrans admits only that the May 17, 2005 letter speaks for itself.

24. Systrans DENIES the allegations in Paragraph 24.

3

25.     Systrans ADMITS that a portion of the May 18, 2005 letter from counsel is accurately quoted. The entire letter appears as Exhibit C to Iron Mountain's Motion for Preliminary Injunction, now being withdrawn.

## Count I

26.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-26 as is set forth fully herein.

27.     Systrans asserts that the contract speaks for itself, and the remaining allegations contain legal conclusions to which no responsive pleading is required.

28.     Systrans DENIES the allegations in Paragraph 28.

29.     Systrans DENIES the allegations in Paragraph 29.

30.     Systrans DENIES the allegations in Paragraph 28. Further, Systrans contends the allegations state a legal conclusion for which no responsive pleading is required.

## Count II

31.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-30 as is set forth fully herein.

32.     Systrans contends that the contract speaks for itself.

33.     Systrans DENIES the allegations in Paragraph 33.

34.     Systrans DENIES the allegations in Paragraph 34. Further, Systrans had agreed with Plaintiff to a payment plan for the monies allegedly owed and Systrans was current on this plan at the time Plaintiff sued Systrans.

4

35.     Systrans DENIES the allegations in Paragraph 35.

36.     Systrans DENIES the allegations in Paragraph 36.

## Count III

37.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-38 as is set forth fully herein.

38.     Systrans DENIES the characterizations of the contract in Paragraph 29 and admits only that the contract speaks for itself.

39.     Systrans DENIES the allegations in Paragraph 39.

40.     Systrans DENIES the allegations in Paragraph 40.

41.     Systrans DENIES the allegations in Paragraph 41.

## Count IV

42.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-41 as is set forth fully herein.

43.     Systrans DENIES the allegations in Paragraph 43.

44.     Systrans DENIES the allegations in Paragraph 44.

45.     Systrans DENIES the allegations in Paragraph 45.

46.     Systrans DENIES the allegations in Paragraph 46.

5

**Count V**

47.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-46 as is set forth fully herein.

48.     Systrans DENIES the allegations in Paragraph 48.

49.     Systrans DENIES the allegations in Paragraph 49.

50.     Systrans DENIES the allegations in Paragraph 50.

51.     Systrans DENIES the allegations in Paragraph 51.

**Count VI**

52.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-52 as is set forth fully herein.

53.     Systrans DENIES the allegations in Paragraph 53.

54.     Systrans DENIES the allegations in Paragraph 54.

55.     Systrans DENIES the allegations in Paragraph 55.

56.     Systrans DENIES the allegations in Paragraph 56.

**DEFENDANT'S AND COUNTER-PLAINTIFFS'S AFFIRMATIVE DEFENSES**

And for its Affirmative Defenses to Plaintiff's First Amended Complaint, Systrans avers:

1.     Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have personal jurisdiction over the Defendant.

2.     Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have subject jurisdiction over the dispute.

6

3.    The relief sought by the Plaintiff is barred by the doctrine of Unclean Hands.

4.    Plaintiff has failed to state a claim upon which relief can be granted.

5.    Plaintiff has failed to join parties indispensable pursuant to Rule 19.

6.    Plaintiff's claims are barred by estoppel.

7.    Plaintiff's Complaint is frivolous and otherwise violates Rule 11.

8.    Certain of Plaintiff's claims have been mooted by Court order.

9.    Defendant and Counter-Plaintiff reserve its right to assert additional defenses as discovery in these proceedings may support.


## COUNTER-CLAIMS

Defendant and Counter-Plaintiff Systrans, by its undersigned counsel, brings this action against the Plaintiff and Counter-Defendant Iron Mountain, and states:


### Nature of Action

1.    Prior to January 2001, Iron Mountain Incorporated merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain ("Iron Mountain"). At all times relevant to this Counter-Claim, Iron Mountain, as a result of its acquisition of Pierce Leahy, was one of the world's leading document retention and storage companies in the world worth almost $4 billion. Iron Mountain employs approximately 15,000 people. To be sure, no company in the United States comes close to being able to directly compete with Iron Mountain's dominance in this industry.

7

2. Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3. Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4. Upon information and belief, Pierce had signed a "non-compete" agreement as part of the aforementioned commercial transaction.

5. On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6. In the months following the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex that, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

7. At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of Pierce's non-compete agreement), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8

8. The proceedings described in Paragraph 7 are currently on appeal. However, it is believed that Iron Mountain has recently reimbursed Pierce between $1 million and $2 million for Pierce's counsel fees as a result of Pierce prevailing in the arbitration.

9. One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain at one of the many warehouses Iron Mountain acquired from Pierce Leahy.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Gary Watzke, Iron Mountain's General Counsel, that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain. Carr protested in writing to Watzke.

11. In August 2001 a senior 'entourage' from Iron Mountain, including its President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny), came to New Jersey and met with Carr and revealed at that time, for the first time, their true agenda: a discussion of what they believed were unlawful acts being committed by Pierce.

12. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Carr would assist Iron Mountain in confirming what it already suspected about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate Carr in various ways which they, Iron Mountain, were confident Carr would find acceptable.

9

13. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup some or all of the $1.2 billion Iron Mountain paid to acquire of Pierce's company.

14. Thereafter, a series of meetings transpired among Iron Mountain, its agents (see Paragraph 15) and Carr, his counsel Arthur Peslak, and Carr's friend James Neebling, principal of Counter-Plaintiff, Systrans Freight, Inc., (hereinafter "Systrans"). While literally scores of conversations occurred among these parties over a two and half year period the more notable meetings or conversations occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York. To be clear, the meetings and conversations between the parties occurred with the active participation of Iron Mountain's Chairman and Chief Executive Officer (Richard Reece), President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny) as well as Iron Mountain's agents, as described in Paragraph 15.

15. Also involved in these meetings and negotiations on behalf of Iron Mountain were its outside counsel, the law firms of Sullivan and Worcester and Morgan Lewis. Attorneys Larry Varn, Samuel Miller, William Matlock, and Beth Jacobson, were all either partners or associates of Sullivan and Worcester, acting on behalf of Sullivan and Worcester, and had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Attorney Doreen Davis, a partner of Morgan Lewis, acting on behalf of Morgan Lewis, had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Iron Mountain and/or Sullivan and Worcester retained Charlie Moore to serve as the primary liaison with Carr and Systrans. (Collectively, the attorneys and law firms of Sullivan and

10

Worcester and Morgan Lewis and Charlie Moore are referred to as Iron Mountain's "agents".)

16. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included Iron Mountain and its agents on the one hand, and Carr, Peslak and Systrans, on the other hand, Iron Mountain stated that in consideration for Carr and Neebling providing information and cooperation in the Pierce arbitration, Iron Mountain and one or more of its agents promised Carr and Systrans, *inter alia*, that Systrans would receive nearly $45 Million per year in transportation courier management business for five years.

17. In comparison with Iron Mountain's $4 billion value and nearly 15,000 employees, Systrans was a small business worth less than $1 million and employed less than 15 people. Iron Mountain's business model required it to rely heavily on vendors at an enormous expense and loss of efficiency. In reliance on Iron Mountain's promises, Systrans created software that was specifically designed to effectively to manage third party courier and transportation services for Iron Mountain. Neebling, on behalf of Systrans, purchased hundreds of thousands of dollars of computer software and hardware systems and devoted two and half years of work evaluating Iron Mountain's systems and creating software and technologies that have proven to save Iron Mountain millions in unnecessary expenses and efficiencies. Systrans' software and technology was therefore designed and capable of handling the $45 million in business that Iron Mountain repeatedly promised would be forth coming.

18. As part of Neebling's comprehensive analysis of Iron Mountain's transportation and courier systems he uncovered and disclosed to Iron Mountain massive problems with Iron Mountain's management of these systems. Neebling discovered and disclosed to Iron

11

Mountain: serious violations of Department of Transportation regulations, security clearance violations for courier drivers, incompetent and improperly trained courier drivers (both in-house and third party), incorrectly licensed motor vehicles, failure to comply with insurance regulations for commercial liability, failure to comply with Workers Compensations regulations, and failure to have comprehensive standard operating procedures for drivers that would preclude the chance for loss of theft of information being transported. Discovering and remedying these deficiencies were part of the scope of work that Systrans was to perform, but Iron Mountain refused to allow Systrans to fix these massive internal problems or create a mechanism for Iron Mountain to remedy these deficiencies.

19. During a meeting in 2002, Iron Mountain's CFO, Kenny, told Neebling that Iron Mountain annually incurs well over $125 million in expenses for courier and transportation services. At all times relevant to this Counter-Claim Iron Mountain's representations to Systrans regarding their contract were made based upon Iron Mountain's superior knowledge of its own courier needs and internal business strategies. Separately, Iron Mountain's representations to Systrans regarding its repeatedly stated promise to provide Systrans with $45 million in annual business for five years were made with Iron Mountains' recognition that its decision to honor its promises to Systrans were within Iron Mountain's sole discretion and/or exclusive control.

20. Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce to coincide with the action that Iron Mountain was planning to also file against Pierce. With the intent of orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

12

21. On March 26, 2002, Carr and Neebling met with Iron Mountain's Chairman and CEO (Reece), CFO (Kenny), and General Counsel (Watzke) at Iron Mountain's corporate headquarters in Boston, Massachusetts. Acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and promised Neebling to provide $25 million in courier business to Systrans. During that same conversation, Kenny revised the amount of courier business Iron Mountain would provide to Systrans. Kenny stated, in the presence of Reese and Watzke, that revenues of more than $45 Million would be paid to Systrans each year for a period of five years in return for the cooperation of Carr and Neebling (Systrans) as described above.

22. On April 9, 2002 in a private restaurant room in New York, New York, Carr, Neebling and Peslak met with Varn, Reese and Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

23. Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

24. As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition,

13

Kenny reiterated that in exchange for Neebling and Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

25. In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her, which occurred in April of 2002. Kenny called Mrs. Carr while she and her family were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

26. Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce. Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California. Carr signed the complaint and Iron Mountain coordinated the filing of the action.

27. During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendant by meeting with witnesses, reviewing and investigating commercial transactions involving Pierce and Pierce-related companies, and turning over documents and other materials to the Counter-Defendant and/or its agents. This cooperation involved extensive travel at the request of several of the Counter-Defendant and its agents. Among those to whom Systrans provided the aforementioned information and cooperation were, in part, Varn, Miller, Davis, Watzke, and Moore. Indeed, Varn, Miller,

14

Davis and Moore met with Neebling and reviewed key testimony and evidence regarding the Pierce arbitration. Varn and Miller, on behalf of Sullivan and Worcester, shared pleadings and depositions from the arbitration with Neebling and asked for Neebling's analysis of the pleadings and testimony.

28. In direct and full reliance on the aforementioned promises of consideration, Neebling continued to cooperate with the Counter-Defendant, as they had requested and, as a result of his reliance on behalf of Systrans, has virtually lost the entire Systrans businesses as a result of Iron Mountain's failure to provide Systrans with the nearly $45 million in revenue for five years as it had promised.

29. While Iron Mountain repeatedly promised Systrans that it would provide Systrans with $45 million in revenue for five years for its courier management technology services, Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans this level of business. Iron Mountain's representations were false at the time they were made and were designed merely to ensure Neebling and Carr's cooperation in Iron Mountain's prosecution of its arbitration action against Pierce. Once Iron Mountain decisively lost the arbitration and was forced to pay Pierce's cost to defend himself, Iron Mountain promptly turned on Systrans and Neebling and began to systematically strangle Systrans economically by not providing it with enough revenue to survive.

30. In approximately September 2003, Carr and Neebling attended a meeting with Varn and Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within

15

the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

31. All of the aforementioned contractual obligations and promises, which the Counter-Defendant presented to Neebling on behalf of Systrans, were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

32. Despite repeated requests from Carr, his New Jersey counsel Peslak as well as his Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants refused to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

## Count I

### **Breach of Contract**

33. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 32 as if repeated herein.

34. The transactions as between Iron Mountain and Systrans do constitute a binding oral contract supported by adequate consideration.

35. Systrans has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

36. Iron Mountain failed to perform its promises and obligations pursuant to the aforementioned oral contract as described above, which does constitute a material breach of said oral contract.

16

37. As the direct and proximate result of the aforementioned material breach of contract by the Counter-defendant, Systrans has been damaged.

38. WHEREFORE, the Counter-Plaintiff Systrans demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

### Count II

### Negligent Misrepresentation

39. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 38 as if repeated herein.

40. Iron Mountain repeatedly promised Systrans, through its owner, that it would direct to the company $45 million in revenue for five years, in exchange for Neebling's information and cooperation in prosecuting the Pierce arbitration, as more fully described in paragraph 21.

41. Iron Mountain received from Neebling critical information known to Neebling, which information was sought by the Counter-Defendant in the prosecution of its claims against Pierce. Moreover, Iron Mountain gained Neebling's complete cooperation in assisting Iron Mountain in filing a separate action against Pierce.

42. At the time the representations set forth in Paragraph 40 were made to Neebling, the Counter-Defendant, had superior knowledge, recognized that the ability and decision to honor its contract with Systrans was in its sole discretion and/or its exclusive control, and/or that at the time the statements were made Iron Mountain did not intend to honor its promises, making the statements to Systrans false when they were made.

3869089v2

43. That, as more fully explained above, Systrans did in fact rely on the aforementioned false statements, not knowing them to be false, to its detriment in that Systrans invested money, and effort in developing technology specifically for Iron Mountain and Iron Mountain's false representations caused Systrans to suffer massive business losses and effectively, the business itself.

44. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' negligent misrepresentations, Systrans has been damaged.

WHEREFORE, Systrans demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

SYSTRANS DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

By its attorneys,

_____/S/ Stone_____
Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
(617) 371-1050


Read K. McCaffrey
Christopher W. Hellmich
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243

18

Iron Mountain, et al. v. Carr & Carr v. Iron Mountain, et al.
Civil Action No. 05-10890 RCL
U.S.D.C. Massachusetts

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INCORPORATED;　)
IRON MOUNTAIN INFORMATION　)
MANAGEMENT, INC.; C. RICHARD　)
REESE; JOHN F. KENNY, JR.; GARRY　)
B. WATZKE; LARRY L. VARN; and　)
CHARLES G. MOORE,　)
　)
        Plaintiffs,　)
　)
       v.　)
　)
THOMAS CARR,　)
　)
       Defendants.　)
　)

## 05  10890 RCL

Civil Action No.

RECEIPT # __63913__
AMOUNT $__250 00__
SUMMONS ISSUED__1__
LOCAL RULE 4.1__−__
WAIVER FORM __−__
MCF ISSUED__−__
BY DPTY. CLK.__MP__
DATE __5/12/05__

MAGISTRATE JUDGE __RBC__

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information

Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"),

Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn"), and Charles G. Moore ("Moore" and

collectively with the foregoing persons and entities, the "Plaintiffs"), by their attorneys, Sullivan

& Worcester LLP, as and for their complaint for declaratory and injunctive relief against

defendant Thomas Carr ("Carr"), allege as follows:

### Statement of Action

1.     This is an action for a declaratory judgment and injunctive relief. Carr claims,

falsely, that certain of the Plaintiffs made promises to or entered into one or more agreements

with him and that those promises or agreements have not been fulfilled. Plaintiffs deny the

existence of any unperformed promises to, or agreements with, Carr and therefore are entitled to

a binding declaratory judgment and order that they have no agreements with or other legal

{B0400083; 1}

obligations to Carr and to a preliminary and permanent injunction against Carr and anyone acting in concert with him from instituting or prosecuting any actions or otherwise continuing to pursue such false claims.

Parties

2.      Iron Mountain (NYSE: IRM) is a Pennsylvania corporation with a principal place of business located at 745 Atlantic Avenue, Boston, Massachusetts. Iron Mountain is the global leader for outsourced records and information management services ("RIMS").

3.      IMIM is a Delaware corporation with a principal place of business located at 1000 Campus Drive, Collegeville, Pennsylvania. IMIM is a wholly-owned subsidiary of Iron Mountain.

4.      Reese is an individual who resides in Boston, Massachusetts. Reese is now, and was at all times material to the matters alleged herein, the Chairman of the Board of Directors and Chief Executive Officer of Iron Mountain and Chief Executive Officer of IMIM.

5.      Kenny is an individual who resides in Hingham, Massachusetts. Kenny is now, and was at all times material to the matters alleged herein, an Executive Vice President and the Chief Financial Officer of Iron Mountain and IMIM.

6.      Watzke is an individual who resides in Marblehead, Massachusetts. Watzke is now, and was at all times material to the matters alleged herein, a Vice President and the General Counsel of Iron Mountain and IMIM.

7.      Varn is an individual who resides in Watertown, Massachusetts. Varn is now, and was at all times material to the matters alleged herein, a partner of Sullivan & Worcester LLP ("S&W"), which regularly represents Iron Mountain and IMIM.

8.      Moore is an individual who resides in Plymouth, Massachusetts. Moore is the principal of C.G.M. Private Detective Group, and was engaged by Varn and S&W, in their

- 2 -

capacity as counsel to Iron Mountain and IMIM, to provide investigatory services regarding various matters referred to herein.

9.    Carr is an individual who, upon information and belief, resides at 152 Chestnut Way, Manalapan, New Jersey.

Jurisdiction and Venue

10.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the dispute occurred in this judicial district.

Background

12.    Beginning in the fourth quarter of 2000, Iron Mountain and IMIM commenced an investigation of the alleged activities of an Iron Mountain director who was the former president of IMIM and a new competitor in the RIMS industry. At that time, Iron Mountain and IMIM had received credible information that the Iron Mountain director, directly and through certain of his associates, was surreptitiously financing, supporting, and providing advice to a competitor in violation of certain restrictive covenants and his fiduciary obligations to Iron Mountain and its stockholders. S&W and Varn represented Iron Mountain and IMIM in connection with this investigation, and Moore provided investigatory services to S&W, in connection with this investigation. The investigation culminated in a series of actions.

13.    In the fall of 2001, during the course of Iron Mountain and IMIM's investigation, Carr contacted Watzke purporting to have information relevant to the investigation.

- 3 -

14.     Beginning in the fall of 2001 and spanning through 2002 and 2003, the Plaintiffs had various communications and dealings with Carr regarding the information that Carr claimed to be relevant to Iron Mountain's and IMIM's investigation.

15.     As Iron Mountain and IMIM continued their investigation, they discovered significant credibility issues with respect to Carr including, but not limited to, his inability to corroborate certain statements and his propensity to embellish and exaggerate certain confirmed facts.

16.     Carr, personally and through his recently-retained counsel, has claimed that during the course of the communications and dealings between Plaintiffs and Carr, one or more of the Plaintiffs made promises to or entered into agreements with Carr. Carr claims that many of these communications occurred in Massachusetts or by way of interstate communications wherein one or more of the participants was in Massachusetts.

17.     For example, Carr claims that there was a March 26, 2002 meeting at Iron Mountain's corporate headquarters at 745 Atlantic Avenue, Boston, Massachusetts, among Carr, Kenny, Reese, Watzke, and other individuals not named in this complaint. Carr claims that during this March 26, 2002 meeting Iron Mountain promised "to hire Carr as transportation consultant and to provide $25 Million in courier business to Carr" and another individual.

18.     Carr also claims that on April 2, 2002, he participated in a telephone conference with his attorney and Watzke, whose office is located at Iron Mountain's corporate headquarters in Boston. Carr claims that "Watzke promised that [Iron Mountain] would pay for Carr's attorneys fees in his suit against [Carr's former partner] and [Iron Mountain] would give Carr employment."

-4-

19.    Carr further claims that on April 2, 2002, his attorney participated in a telephone conference with Watzke and that "Watzke told [Carr's attorney] that R. Reese had asked him, Watzke, to call [Carr's attorney] and to inform [Carr's attorney] that 1) [Iron Mountain] would support Carr, 2) [Iron Mountain] would pay [Carr's attorney's] entire bill once the [then pending] arbitration . . . had been concluded, and 3) that once the arbitration had been concluded, R. Reese on behalf of [Iron Mountain], would meet with [Carr's attorney] and Carr to discuss the fulfillment of [Iron Mountain's] promises to Carr."

20.    Carr, personally and through his counsel, claims that the Plaintiffs have not fulfilled the promises or agreements set forth above, and others, and that Carr has lost or been deprived millions of dollars as a result.

Count I:  Declaratory Judgment and Injunctive Relief

21.    The Plaintiffs incorporate by reference herein the allegations in paragraphs 1 through and including 20 as if set forth in full herein.

22.    Carr claims that the Plaintiffs made promises to or entered agreements with Carr and that those promises or agreements have not been fulfilled.

23.    Contrary to Carr's claims, the Plaintiffs have no unfilled promise to, or agreements with, or any other legal obligations to, Carr.

24.    The Plaintiffs and Carr have adverse legal interests and an actual controversy exists and is continuing between Plaintiffs on the one hand, and Carr on the other.

25.    The dispute between the Plaintiffs and Carr is a real and substantial controversy, which is justiciable by this Court pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201.

26.    By reason of the foregoing, the Plaintiffs are entitled to a conclusive decree declaring their rights and legal obligations as they relate to Carr's claims and to a preliminary and permanent injunction enjoining and restraining Carr and others from from instituting or

{B0400083: 1}

proceeding with any action or suit against any of the Plaintiffs or any other person or entity in any other jurisdiction with respect to or in any way relating to or arising out of any alleged promises by or agreements with any of the Plaintiffs or any person or entity affiliated or associated with any of them.

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.   Declare that the Plaintiffs have no agreements or other legal obligations to Carr;

2.   Enjoin and restrain Carr or any of his agents, servants, employees, or attorneys from instituting or proceeding with any action or suit against any of the Plaintiffs or any other person or entity in any other jurisdiction with respect to or in any way relating to or arising out of any alleged promises by or agreements with any of the Plaintiffs or any person or entity affiliated or associated with any of them; and

3.   Award the Plaintiffs such further relief as the Court deems just, including without limitation reasonable attorneys' fees and disbursements.

> **IRON MOUNTAIN INCORPORATED;**
> **IRON MOUNTAIN INFORMATION**
> **MANAGEMENT, INC.; C. RICHARD**
> **REESE; JOHN F. KENNY, JR.; GARRY**
> **B. WATZKE; LARRY L. VARN; and**
> **CHARLES G. MOORE**
>
> By their attorneys,
>
> _____
> Ira K. Gross (BBO #212720)
> *igross@sandw.com*
> Samual A. Miller (BBO #648568)
> *smiller@sandw.com*
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, Massachusetts 02109
> (617) 338-2800

May 2, 2005

- 6 -

Iron Mountain, et al. v. Carr & Carr v. Iron Mountain, et al.
Civil Action No. 05-10890 RCL
U.S.D.C. Massachusetts

# Exhibit 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>THOMAS CARR, )<br><br>Defendant )<br><br>And )<br><br>THOMAS CARR, )<br><br>Counter-Plaintiff )<br><br>v. )<br><br>IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, )<br><br>Counter-Defendants ) | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S MOTION FOR LEAVE OF COURT TO FILE A SECOND AMENDED COUNTER-CLAIM

Defendant and Counter-Plaintiff Thomas Carr, by his undersigned counsel and pursuant to Rule 15 of the Federal Rules of Civil Procedure, herewith moves this Honorable Court for Leave to Amend the Counter-Claim previously filed herein and states:

1

3870266v1

## I. Preliminary Statement

Defendant and Counter-Plaintiff Carr filed an Answer and Counter-Claim in these proceedings on or about May 05, 2005. Thereafter, prior to any responsive pleading being filed by the Counter-Defendants, the Counter-Plaintiff filed a First Amended Counter-Claim on or about May 20, 2005, no leave of Court being required.

The Counter-Defendants have now responded and their response includes motions by two of the Counter-Defendants to dismiss both counts of the First Amended Counter-Claim and a motion by all Defendants to dismiss Count II only, Carr's claim of Fraudulent Misrepresentation.

## II. Argument

Undersigned counsel respectfully represents that allegations set forth in the proposed Second Amended Counter-Claim (a copy of which is attached hereto as Exhibit A) will moot the averments of pleading deficiencies set froth in the Counter-Defendants' motions described above.

Moreover, as the Court is well aware, the granting of leave to amend is looked upon favorably where the interests of justice will be served as is discussed in the Memorandum of Reasons and Citations of Authority in support thereof.

In the instant proceedings, as more specifically described in the proposed Second Amended Counter-Claim, Mr. Carr and his family were contacted on repeated occasions by the very top management of Iron Mountain, a billion dollar corporation, and their outside counsel, Sullivan and Worcester, insisting on Carr's cooperation in their legal battles with Peter Pierce, a one-time competitor, in return for the payment of moneys and

2

the indemnification of Carr and his family as well as his small transportation company against losses that may result from his cooperation.

Mr. Carr cooperated, and he lost everything. Iron Mountain now refuses to make good on their promises by denying that the promises were ever made.

### III. Prayer for Relief

Respectfully, justice requires this Honorable Court's granting Mr. Carr's Motion for Leave to File a Second Amended Counter-Claim.

June 9, 2005

Respectfully submitted,

By his attorneys,

Read K. McCaffrey *(pro hac)*
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmccaffrey@pattonboggs.com

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

3

3870266v1

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| THOMAS CARR, ) | |
| ) | |
| Defendant ) | Civil Action No. |
| ) | |
| And ) | |
| ) | 05 10890 RCL |
| THOMAS CARR, ) | |
| ) | |
| Counter-Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| IRON MOUNTAIN INCORPORATED; ) | |
| IRON MOUNTAIN INFORMATION ) | |
| MANAGEMENT, INC.; C. RICHARD ) | |
| REESE; JOHN F. KENNY, JR.; GARRY ) | |
| B. WATZKE; LARRY L. VARN; AND ) | |
| CHARLES G. MOORE, ) | |
| ) | |
| Counter-Defendants ) | |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S SECOND AMENDED COUNTER-CLAIM

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings herewith Amends the Defendant's and Counter-Plaintiff's First Amended Counter-Claim filed previously herein against the Plaintiffs and Counter-Defendants and states:

1

3870374v1

## **Facts Common To All Counts**

1.    Prior to January 2001, Iron Mountain Incorporated (Iron Mountain) and Iron Mountain Information Management, Inc. (IMIM), hereinafter referred to as Iron Mountain, merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain.

2.    Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3.    Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4.    Upon information and belief, Pierce had signed a form of non-compete agreement as part of the aforementioned commercial transaction.

5.    On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6.    In the months which followed the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex which, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

2

7.     At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8.     The proceedings described in the foregoing Paragraph are currently on appeal.

9.     One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain.

10.     On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11.     Mr. Carr protested in writing to Mr. Watzke.

12.     In August 2001 a senior 'entourage' from Iron Mountain, including its President, General Counsel and Chief Financial Officer, came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce.

13.     At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate

3

Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

14.    On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierce's company of $1.2 Billion.

15.    Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

16.    During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, one or more of the Counter-Defendants promised (as particularized in paragraphs 17-24 and 28-29):

16.1    The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

4

16.2    The provision of the sum of $5 Million to allow Carr to buy back Pioneer Capital/Pierce's 51% share of Logisteq;

16.3    To hire Carr as a transportation consultant at wages equal to those paid by Logisteq, plus full benefits;

16.4    To ensure the transportation company owned by Mr. Neebling, (which had been capitalized as a start up by Mr. Carr) would receive nearly $50 Million per year in courier business;

16.5    The payment of $2 Million directly to Mr. Carr as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's wasting of Logisteq.

16.6    The provision of assurances to Mr. Carr's creditor, Mr. Paul Schwarz, that Iron Mountain would provide sufficient funds and revenues to Carr to enable Mr. Schwartz to conclude that Mr. Carr was a good candidate to whom a loan of moneys could be made; and

16.7    The provision of assurances that in the event that any negative financial effects befell Mr. Carr, his family or his businesses as a result of his cooperation with Iron Mountain in their disputes with Mr. Pierce, that Iron Mountain would, in essence, indemnify Mr. Carr and his family and businesses against any such negative effects.

17.    Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce on behalf of Systans to coincide with the action that Iron Mountain was planning to also file against Pierce.   With the intent of orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought

5

to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

18.     On March 19, 2002, Carr, Neebling and Peslak attended a meeting in Casa Dante, New Jersey with the general counsel of Iron Mountain, Garry Watzke. Mr. Watzke, individually and as an agent of Iron Mountain and acting with such authority, stated that, in return for Mr. Carr's cooperation in the Iron Mountain/Pierce litigation, Iron Mountain would fund Mr. Carr's lawsuit against Mr. Pierce and employ Mr. Carr in the event that Mr. Pierce locked him out of Logisteq.

19.     On March 26, 2002, Carr and Neebling met with John F. Kenny, Richard Reese and Watzke at Iron Mountain's corporate headquarters in Boston, Massachusetts. Individually as well as acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc. Finally, Counter-Defendant Kenny advised that courier business revenues of $45 Million would be paid to Systrans, Inc. each year for a period of five years in return for the cooperation of Carr and Systrans as described above.

20.     On April 2, 2002 Carr and Peslak participated in a conference call to Watzke. During this call, Watzke, individually and acting within the scope of his authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys'

6

fees in his suit against Pierce. During this call, Watzke also promised Carr that Iron Mountain would retain Carr in a consulting position.

21.    On April 9, 2002 at a private residence in New York, New York, Carr, Neebling and Peslak met with Larry L. Varn, Richard Reese and John F. Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

22.    Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

23.    As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition, Kenny also promised that in exchange for Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

24.    In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her which occurred in April of 2002. Mr. Kenny called Mrs. Carr while she and her family

7

were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

25.     Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce. Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California. Carr signed the complaint and Iron Mountain coordinated the filing of the action.

26.     During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendants, met with witnesses, reviewed and checked out commercial transactions involving Pierce and Pierce-related companies, and turned over documents and other materials to various of the Counter-Defendants. This cooperation involved extensive travel at the request of several of the Counter-Defendants.

27.     In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants, as they had requested and, as a result of his reliance, he lost his businesses and was shackled with debt which several of the Counter-Defendants, as described above, had promised to allay by providing sufficient income to Carr to allow him to comfortably handle the debt.

8

28.    During a July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 16.1 through 16.7 and further described in paragraphs 17 through 24, Mr. Watzke stated, individually and in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

29.    Soon after the events set forth in paragraph 28, Counter-Defendant Moore told Carr, in a telephone conversation, the same assurances which had been conveyed by Watzke to Peslak on July 16, 2003. This was consistent with Moore's role as the prime contact with Mr. Carr as designated by Iron Mountain and the individual Plaintiffs and Counter-Defendants. Mr. Moore would frequently, in conversations with Mr. Carr, restate and otherwise affirm statements of consideration previously made by Mr. Watzke, Mr. Kenny, Mr. Varn, and Mr. Reese.

30.    In approximately September 2003, Carr and Neebling attended a meeting with Varn and Charles G. Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

9

31.    In addition, Varn called Paul Schwartz, a person to whom Carr owed money, to advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr therefore was a good credit risk to whom Mr. Schwartz should loan additional moneys.

32.    All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

33.    Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

34.    In hindsight, because there is no arguable relationship between the fulfillment of Iron Mountain's contractual obligations to Mr. Carr and the ultimate termination of Iron Mountain's appeal of the Iron Mountain vs. Pierce arbitration decision, it is now readily apparent that at the time Iron Mountain described the consideration it would pay to Carr in return for Carr's cooperation, including Carr's filing of a lawsuit against Pierce, as coordinated by Iron Mountain, Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations and knew that statements regarding said considerations were false, when made.

35.    As a direct result of Carr's cooperation with Iron Mountain including his filing of a complaint against Pierce, orchestrated by Iron Mountain, Pierce wasted the

10

business of which Carr was a 49% owner and left Carr shackled with debt and a loss of his source of income.

36.     Carr however believed that Iron Mountain would make good on his statements of consideration of employment, business and indemnification and when Carr demanded satisfaction from Iron Mountain, he was met with silence and/or denial.

37.     As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business and his source of personal income and is faced with significant debt.

38.     In February 2005, Carr's counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

39.     On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

40.     On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

41.     On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to counsel's request for a meeting due to the unavailability of Mr. Varn.

42.     Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to the request for a meeting until some time late in the week of May 2.

3870374v1

43. Finally, on May 1, 2005, counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

44. The response to the foregoing was the filing and delivering of the instant Complaint.

## Count I

## (Breach of Contract)

45. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

46. The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

47. Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

48. Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

49. As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

3870374v1

**Count II**

**(Against Counter-Defendants Varn, Watzke, Reese, Kenny and Moore)**

**(Fraudulent Misrepresentation)**

50.    Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

51.    Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce as well as Carr's complete cooperation in filing a separate action against Pierce.

52.    The Counter-Defendants explained to Carr that the consideration for the information and cooperation described herein would include the consideration described in Paragraphs 16.1 through 16.7, 17 through 24 and 28 through 30 above.

53.    At the time the representations set forth in the foregoing Paragraph were made to Carr, the Counter-Defendants knew that they were false, knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

54.    The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

55.    That, as more fully explained above, Carr did in fact rely on the aforementioned false statements, not knowing them to be false, to his detriment in that he suffered massive business losses and faced mounting debt all of which, he believed, would

13

be comfortably off-set by the aforementioned representations of considerations. They were not.

56.     As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

June 9, 2005

                                        Respectfully submitted,


                                        By his attorneys,


                                        _____
                                        Read K. McCaffrey (pro hac vice)
                                        PATTON BOGGS, LLP
                                        2550 M Street, NW
                                        Washington, DC 20005
                                        (202) 457-5243
                                        rmcccaffrey@pattonboggs.com


                                        Kathleen C. Stone
                                        BBO #481920
                                        Looney, Cohen, Reagan & Aisenberg LLP
                                        109 State Street
                                        Boston, MA 02109
                                        617-371-1050

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS CARR, <br><br> Defendant <br><br> And <br><br> THOMAS CARR, <br><br> Counter-Plaintiff <br><br> v. <br><br> IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, <br><br> Counter-Defendants | Civil Action No. <br><br> 05 10890 RCL |

## ORDER

In consideration of Counter-Plaintiff Thomas Carr's Motion to Consolidate the above-captioned action with the case of *Iron Mountain Information Management, Inc. v. Systrans Freight Systems, Inc.* Civil Action No. 05-10999-MLW and any opposition thereto, it is this ___ day of _____, 2005 **ORDERED:**

1

3877365v2

Counter-Plaintiff Thomas Carr's Motion to Consolidate the above-captioned action with the case of *Iron Mountain Information Management, Inc. v. Systrans Freight Systems, Inc.* Civil Action No. 05-10999-MLW is **GRANTED**.

_____

Judge
United States District Court
for the District of Massachusetts

3877365v2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENTM INC.<br>Plaintiff | ) ) ) ) |
| v. | ) )     CIVIL ACTION NO. 05-109999-RCL |
| SYSTRANS FREIGHT SYSTEMS, INC.<br>Defendant | ) ) ) |
| AND | ) ) |
| SYSTRANS FREIGHT SYSTEMS, INC. | ) ) |
| Counter-Plaintiff, | ) ) |
| v.<br>IRON MOUNTAIN INFORMATION MANAGEMENTM INC. | ) ) ) ) |
| Counter-Defendant. | ) ) |

## ORDER

In consideration of Defendant and Counter-Plaintiff Systrans Freight Systems, Inc's Motion to Consolidate the above-captioned action with the case of *Iron Mountain et al. v. Carr* Civil Action No. 05-10890- RCL and any opposition thereto, it is this ___ day of _____, 2005 that the motion is **GRANTED.**

///

///

///

1

**IT IS ORDERED:**

This action is to be consolidated for all purposes with *Iron Mountain et al. v. Carr* Civil Action No. 05-10890-RCL.

_____

Judge, United States District Court