UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., | ) ) ) | |
| Plaintiff and Counterclaim-Defendant, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-10999-MLW |
| SYSTRANS FREIGHT SYSTEMS, INC., | ) ) | |
| Defendant and Counterclaim-Plaintiff. | ) ) ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO CONSOLIDATE

Plaintiff and Counterclaim-Defendant Iron Mountain Information Management, Inc. ("IMIM"), hereby responds to the motion by Defendant and Counterclaim-Plaintiff Systrans Freight Systems, Inc. ("Systrans"), to consolidate this action with the presently pending action before this Court captioned Iron Mountain Incorporated, et al. v. Thomas Carr, Civil Action No. 05-10890-RCL (the "Carr Action"). Contrary to Systrans' contention, IMIM does not necessarily oppose consolidation of the two actions. As was explained to Systrans' counsel who is also counsel to Thomas Carr, the defendant and counterclaim-plaintiff in the Carr Action, it is IMIM's position that the Court should defer any consolidation pending decisions on the pending motions addressed to the pleadings, particularly the motions to dismiss the counterclaims in both actions and Carr's motion to amend his counterclaims in the Carr Action, which motion is opposed by the plaintiffs in that action. Deferring any decision on consolidation until the status of the pleading has been resolved will permit the Court to determine whether there is anything left to consolidate and, if so, which parties and issues, if any, overlap the two actions.

{B0426589; 1}

A copy of the Plaintiffs' Response to Motion to Consolidate in the Carr Action is attached hereto as Exhibit A, and IMIM respectfully incorporates those papers in this response.

**IRON MOUNTAIN INFORMATION MANAGEMENT, INC.**

By its attorneys,

July 25, 2005

/s/ Samual A. Miller
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE,<br><br>Plaintiffs and Counterclaim-Defendants,<br><br>v.<br><br>THOMAS CARR,<br><br>Defendant and Counterclaim-Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION<br>NO. 05 10890 RCL |

## PLAINTIFFS' RESPONSE TO MOTION TO CONSOLIDATE

Plaintiffs and Counterclaim-Defendants hereby respond to the motion by Defendant and Counterclaim-Plaintiff Thomas Carr ("Carr") to consolidate this action with Iron Mountain Information Management, Inc. v. Systrans Freight Systems, Inc., Civil Action No. 05-10999-MLF (the "Systrans Action"). Contrary to Carr's contention, the Plaintiffs do not necessarily oppose consolidation of the two actions. As was explained to Carr's counsel, it is Plaintiffs' position that the Court should defer any consideration of consolidation pending decisions on Plaintiffs' motions to dismiss the counterclaims in both this case and in the Systrans Action and Carr's motion, opposed by Plaintiffs in part on futility grounds, further to amend the counterclaims in this action. Deferring any decision on consolidation until the status of the pleadings has been resolved will permit the Court to determine whether there is anything left to consolidate and, if so, which parties and issues, if any, overlap in the two actions.

## Background and Procedural History

Some of the background of these matters is set forth in the Plaintiffs' previously filed motions to dismiss the counterclaims in both actions and in Plaintiffs' opposition to Carr's motion further to amend the counterclaims in this action. A more detailed history of the parties' dealings will be included in Plaintiff's opposition to Carr's pending motion to disqualify Plaintiffs' counsel. Procedural histories of these two actions follow.

## The Carr Action

On May 2, 2005, the Plaintiffs filed the Complaint for Declaratory Judgment and Injunctive Relief in this action, seeking a binding declaratory judgment and order that they have no agreements with or other legal obligations to Carr. Carr counterclaimed, alleging that the Plaintiffs breached a litany of alleged oral promises and made various misrepresentations. After Carr amended his counterclaims as of right under Fed. R. Civ. P. 15 and the Plaintiffs moved to dismiss them for, among other reasons, failure to state any legally cognizable claim, Carr sought leave to amend his counterclaims a second time. Plaintiffs opposed the motion to amend on the grounds of futility.

Specifically, the Plaintiffs argue that Carr's claim of an alleged breach of contract is futile because the agreements alleged by him, even assuming that they were made, would violate established public policy and are unenforceable. The breach of contract claim is also unenforceable against the individual Plaintiffs because Carr fails to allege that they are parties to any alleged agreement. Nor is Carr's amended misrepresentation claim any more viable than in his prior pleadings because, stripped to the essentials, all of the alleged "representations" are promissory and forward-looking in nature and cannot, as a matter of law, support a fraudulent misrepresentation claim. Additionally, even in his <u>third</u> attempt to state viable claims, Carr has not alleged reasonable reliance on any alleged promise, nor has Carr alleged specific facts, as

{B0426511; 3}

Fed. R. Civ. P. 9(b) plainly requires, indicating an intent to deceive.  Plaintiff's submit that

Carr's counterclaims should be dismissed in their entirety.

### The Systrans Action

On May 13, 2005, Iron Mountain Information Management, Inc. ("IMIM"), the only

plaintiff in the Systrans Action, filed a Complaint, subsequently amended, asserting that, among

other things, although IMIM had made full and timely payments to Systrans pursuant to a written

contract, Systrans failed to pay certain vendor invoices, as required by the Contract.  Systrans

answered the Complaint and counterclaimed against IMIM, alleging that IMIM had breached an

oral contract and made various misrepresentations.  On July 14, 2005, IMIM moved to dismiss

Systrans' counterclaims.  The Plaintiff's memorandum in support of its motion to dismiss is

attached hereto as Exhibit 1.  IMIM has argued that even if it existed (which it does not), the

alleged oral agreement is unenforceable because (i) it has been superseded by a written

instrument, and (ii) it runs afoul of the Statute of Frauds.  IMIM further contends that Systrans'

misrepresentation claim is not viable because the representations purportedly made by IMIM are

so vague that any reliance would not be justifiable.  As with Carr's counterclaims, it is IMIM's

position that Systrans' counterclaims should be dismissed in their entirety.

Carr's motion to consolidate, which Systrans joins, relies on unsupported and

undocumented allegations.  The Plaintiffs in this case, and IMIM in the Systrans Action, (i)

dispute the existence of any oral agreements or promises with or to Carr or Systrans; (ii) deny

that anybody made any misrepresentations to Carr or Systrans; and (iii) deny that Carr or

Systrans has been damaged in any manner.  Carr's unsupported suppositions, grounded only in

allegations and rhetoric, are simply not warranted on the naked record before this Court.

## Argument

In view of the uncertain procedural status of this action and the Systrans Action and the unsettled state of the pleadings, which are subject to the pending motions to dismiss and amend in this action and the motion to dismiss in the Systrans Action, the Court should defer any decision on consolidation until those motions are decided and, if the actions are not dismissed *in toto*, the contours of the pleadings are firmly established.

### The Court Should Defer any Decision on Consolidation

The issue of commonality of the parties, facts and law between this action and the Systrans Action cannot be determined until the contours of the pleadings are established, rendering any consideration of consolidation unwarranted and premature until that time. In this Circuit, a district court should not exercise its discretion to consolidate actions unless "the two proceedings involve a common party *and* common issues of fact or law." Seguro de Servicio de Salud v. McAuto Sys. Group, Inc., 878 F.2d 5, 8 (1st Cir. 1989) (emphasis in original). Only after this determination is made, is the district court to weigh the costs and benefits of consolidation to decide whether that procedure is appropriate. Id. Given the motions to dismiss the counterclaims in both actions – the claims that provide the only conceivable basis for an assertion of "common issues of fact or law" – the cases are simply not ripe for a commonality determination.

Despite the rhetoric in Carr's motion to consolidate, the granting of a motion to consolidate is not automatic; courts in this circuit closely examine whether consolidation is appropriate. See, e.g., Seguro de Servicio de Salud, 878 F.2d at 9-10 (reversing consolidation order); Willard v. Town of Lunenburg, 202 F.R.D. 57, 59-60 (D. Mass. 2001) (denying motion to consolidate actions); Norfolk v. United States Envt'l Protection Agency, 134 F.R.D. 20, 22 (D. Mass. 1991) (same). Indeed, most of the cases cited in Carr's motion papers either denied or

{B0426511; 3}

limited any consolidation. The scrutiny required by these cases cannot be carried out until the

Court can be certain which parties, facts and issues, if any, survive the pending motions.

    1.      The Overlapping of the Single Common Party in These Actions is Not Certain to Remain.

Between this action and the Systrans Action, there are a total of nine parties, but there is

only a single common party between the two cases -- IMIM. Carr's conclusory rhetoric aside,

the presence of one common party out of the nine suggests that consolidation of the actions may

very well not save time or effort or result in efficiencies or judicial economy.

Moreover, IMIM has moved to dismiss the counterclaims in both actions. If IMIM were

to be dismissed from either action, there would be no commonality of parties, removing any

basis for consolidation. The viability of Systrans' counterclaims against IMIM, which are based

upon alleged oral promises that IMIM would provide Systrans with a five year $45 million per

year in courier business is highly suspect. Systrans' allegations are directly belied, and barred,

by an integrated written contract between the parties post-dating any alleged oral promises. In

addition, such an alleged five year, oral promise violates the statute of frauds. Similarly, given

the lack of any specificity in the alleged oral promises (markets to be serviced, rates to be

charged, etc.), Systrans' misrepresentation claim is wholly devoid of any allegations sufficient to

show that reliance was justifiable under the law. IMIM should, therefore, be dismissed from the

counterclaims in the Systrans action and, for the reasons set forth in their moving papers, all of

the Plaintiffs should be dismissed from the counterclaims in this action. Accordingly, the Court

should reserve any decision on the motion to consolidate until it is established whether there will

be any common parties going forward in both actions.

2.    <u>The Overlapping of Any Facts or Law in These Actions is Not Certain to Remain.</u>

Carr's motion papers allege with certitude that there are common facts and law between the two cases. This is far from clear. As is set forth in greater detail in Plaintiffs' pending motion papers in this case and in IMIM's motion papers in the Systrans Action, the counterclaims suffer from many of the same fatal defects. At the very minimum, therefore, the existence, or not, of, any common facts or issues of law cannot be ascertained until the pending motions are decided. The absence of any such common issues would, of course, preclude consolidation.

Even were the Court to decide the motion to consolidate on the basis of the commonality of the counterclaims as pleaded, consolidation would not be appropriate. On their face, there is little doubt that the counterclaims <u>appear</u> to be virtually identical. Nevertheless, a close examination of the Systrans' counterclaims reveals that almost three-quarters of the allegations have absolutely no relation to Systrans. Creating a false overlap by pleading irrelevant surplusage, likely for the very purpose of this motion, is a tactic that should not be condoned. Instead, Carr, who has the burden in his motion, should be required to show how the claims relating solely to Systrans share common factual and legal issues with those in Carr's counterclaims. Absent such a true commonality, the motion should be denied.

3.    <u>Deferring a Decision on Consolidation Will Not Prejudice Any Party.</u>

Because the motions addressed to the pleadings in both cases have been fully briefed consolidation now is not likely to save time, expense or effort. To the contrary, reserving any decision until the status of the pleadings is resolved is the more efficient course. Among other things, it eliminates the possibility that a decision to consolidate now will later have to be reconsidered if the configuration and contents of the pleadings changes in a material way.

{B0426511; 3}

Moreover, no rights or available remedies of any party will be affected by deferring a decision on consolidation.

**Conclusion**

For the foregoing reasons, the Plaintiffs respectfully request that the Court defer consideration of Carr's motion to consolidate until the motions to dismiss in this action and the Systrans Action, as well as Carr's further motion to amend his counterclaims, have been decided.

Respectfully submitted,

**IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE**

By their attorneys,

July 25, 2005

/s/ Samual A. Miller
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

{B0426511; 3}

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., | ) ) ) | |
| Plaintiff and Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-10999-MLW |
| SYSTRANS FREIGHT SYSTEMS, INC., | ) ) | |
| Defendant and Counterclaim Plaintiff. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS COUNTERCLAIMS

Plaintiff and Counterclaim-Defendant Iron Mountain Information Management, Inc.

("Iron Mountain") hereby files this memorandum of law in support of its motion to dismiss the

Counterclaims (the "Counterclaims" or "Ctrclms.") of Defendant and Counterclaim-Plaintiff

Systrans Freight Systems, Inc. ("Systrans"). The Counterclaims, consisting of a mishmash of

disjointed claims that Iron Mountain breached an alleged oral agreement and negligently

misrepresented its willingness to execute a contract with Systrans, fail completely to state any

possible claim upon which relief can be granted. Even if it existed (which it does not), the

alleged oral agreement is unenforceable because (i) it has been superseded by a written

instrument, and (ii) it runs afoul of the Statute of Frauds. The misrepresentation claim is not

viable because the representations purportedly made by Iron Mountain are so vague that any

reliance is not justifiable. Additionally, all of the alleged "representations" are promissory and

forward-looking in nature and cannot, as a matter of law, support a misrepresentation claim.

Accordingly, the Counterclaims should be dismissed in their entirety.

### Background

Iron Mountain is a wholly-owned subsidiary of Iron Mountain Incorporated (NYSE: IRM), which is headquartered in Boston, Massachusetts and is the world's leader for outsourced records and information management services. <u>See</u> Cmplt.,[1] ¶ 2. Systrans, based in Bay Head, New Jersey, is a non-asset based third-party logistics provider that uses web-based technology to coordinate and manage transportation. <u>See</u> Cmplt., ¶ 3; Ctrclms., ¶ 16.

In the Counterclaims, which are saturated with allegations wholly irrelevant to the Iron Mountain/Systrans relationship, Systrans alleges that Iron Mountain orally promised Systrans "that Systrans would receive nearly $45 million [stet] per year in transportation courier management business for five years." <u>See</u> Ctrclms., ¶ 16, 17, 19, 21, and 24. Iron Mountain allegedly made these <u>oral</u> promises of a <u>five (5) year</u> transportation management agreement to Systrans at a meeting in Boston on March 26, 2002 and at other times during 2002. <u>Id.</u> Systrans alleges that "Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans this level of business." Ctrclms., ¶ 29. The Counterclaims fail to allege that a single scrap of writing passed between the sophisticated business actors involved (whether it be a confirming correspondence or otherwise) supporting an exchange of promises regarding a five-year, $45,000,000 per year agreement between the Iron Mountain and Systrans. Additionally, the Counterclaims do not allege that the parties even discussed, let alone agreed upon, any specific, but clearly necessary, terms regarding the alleged oral, five-year agreement – e.g., representations regarding the markets Systrans would serve, the services Systrans would provide, or the rates of those services.

---

[1] Citations to admitted portions of the First Amended Complaint shall be referred to as "Cmplt., ¶ ___."

{B0422755; 3}

There are also two noteworthy <u>factual</u> omissions from the Counterclaims.  First, Systrans neglects to mention that Iron Mountain and Systrans executed a <u>written</u> agreement dated May 1, 2003 (the "<u>Contract</u>"), nearly a year <u>after</u> the meeting on March 26, 2002.  <u>See</u> Ex. A to Complaint.[2]  A true and accurate copy of the Contract is attached hereto as Exhibit A.  In the Contract, covering all services Systrans is to provide to Iron Mountain, the parties agreed, among other things, that Systrans would furnish and provide courier and related services for Iron Mountain as Iron Mountain, in its absolute discretion, might order from Systrans.  <u>See</u> Contract, § II.A.1.  The Contract further provides that no amendment shall be effective unless it is reduced to writing and executed by both parties.  <u>See</u> Contract, § III.G.  Additionally, each party's liability under the Contract "or for any other reason relating to or arising from the products and services provided under this Contract" will be limited to amounts paid or received under the Contract.  <u>See</u> Contract, § III.I.

Second, Systrans alleges that it spent money to purchase computer software and hardware systems in reliance on Iron Mountain's alleged oral promises, <u>see</u> Ctrclms., ¶ 17, but Systrans also fails to mention that, in accordance with the Contract, Iron Mountain advanced $105,000 to Systrans to cover startup expenses, and Systrans used the advance to purchase computer software and hardware.  <u>See</u> Contract, § II.A.5.  Not only did Systrans fail to repay this initial advance, but also (i) failed to pay additional advances, and (ii) failed to pay courier vendors over $380,000

---

[2] In its Answer to Iron Mountain's Complaint, Systrans acknowledged the Contract and its execution, and did not dispute its authenticity.  <u>See</u> Answer, ¶¶ 6, 13, 15, and 16. In the First Circuit, while ordinarily any consideration of documents not attached to the counterclaims is forbidden on a motion to dismiss (unless the proceeding is converted into one for summary judgment), courts have made exceptions for documents the authenticity of which are not disputed by the parties. <u>See</u> <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). Iron Mountain submits that Systrans' omission of the Contract from its Counterclaims is intentional, calculated to deprive the court of critically relevant information and to avoid a motion to dismiss.

{B0422755; 3}

after Iron Mountain had paid Systrans funds in that amount, earmarked for that very purpose. These failures, and others, led Iron Mountain to file the Complaint.

## Argument

The Counterclaims may, and should, be dismissed for failure to state a claim if it appears beyond doubt that Systrans can prove no set of facts in support of its claims that would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Since Systrans' allegations are insufficient to sustain any claim for breach of contract or misrepresentation, its attempt to state a claim should be dismissed.

**A.     Systrans' Claim of a Five Year-Oral Contract is Unenforceable.**

1.     The Contract Discharges All Alleged Prior Agreements.

The Contract is an integrated agreement and discharges any alleged prior oral negotiations and agreements between Iron Mountain and Systrans. It is black-letter law in Massachusetts that a completely integrated agreement incorporates all prior negotiations and oral agreements that fall within the scope of the subsequently written contract.[3] See generally Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992) (noting that evidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract); Williams v. Pittsfield Lime & Stone Co., 258 Mass. 65, 68-69, 154 N.E. 572, 573 (1927) ("when the parties have reduced their contract to writing, all

---

[3] The Contract provides that it "shall be governed by the laws of the State of New Jersey." Contract, § III.C. It is equally well established under New Jersey law that an oral promise is unenforceable when it is superseded by a complete written agreement between the parties. See Winans v. Asbury Park Nat'l. Bank & Trust Co., 13 N.J. Super. 577, 581, 81 A.2d 33 (1951) ("[t]he general rule is that an executed contract which covers the whole subject matter embraced in a prior one between the same parties rescinds the prior agreement."). Accordingly, there is no conflict between Massachusetts and New Jersey law on this particular issue (discharge of an oral contract by a subsequent written agreement) and the Court should apply Massachusetts law, the law of the forum, where Massachusetts and New Jersey law are in common. See, e.g., Boston Hides & Furs v. Sumitomo Bank, 870 F. Supp. 1153, 1159 (D.Mass. 1994) (finding a "false conflict" between Massachusetts and New York law and applying the law of the forum state "to the extent it is common to both New York and Massachusetts.").

previous or contemporaneous oral or written negotiations are merged in it and its terms cannot be varied, contradicted, added to, or subtracted from by oral testimony touching such negotiations"); Goldenberg v. Taglino, 218 Mass. 357, 359, 105 N.E. 883, 885 (1914) ("… a contract … is presumed … to express the final conclusion reached and all previous and contemporaneous verbal discussion, or written memoranda, are assumed to be either rejected or merged in it"); see generally Restatement (Second) of Contracts § 209(3) ("[w]here the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.").

As an integrated agreement, the Contract incorporates all prior negotiations and covers the entire scope of the Iron Mountain and Systrans relationship:

> [Systrans] will provide courier services to operate to, from and between Iron Mountain customers and facilities where courier services are not covered by existing contracts, and on a District-by-District basis, as approved by [Iron Mountain].

Contract, § III.A.1. Since Systrans was only in a position to provide "courier services" to Iron Mountain, this provision covers their entire business relationship and all agreements between them. The Contract further states that any modification must be in writing, which evidences the parties' intent that the Contract "contain" the boundaries of the parties' relationship. Accordingly, as a matter of law the Contract is an integrated agreement discharging all prior oral negotiations and agreements.

The Contract's lacking of a formal integration clause does not affect the conclusion that the alleged oral agreement is unenforceable. See Cady v. Marcella, 49 Mass. App. Ct. 334, 338, 729 N.E.2d 1125, 1130 (2000) ("[e]ven in the absence of [an integration] clause, where the written terms of the contract are not ambiguous on their face, extrinsic evidence is not admissible

{B0422755; 3}

to contradict them"); <u>Congregation of the Sisters of Charity of the Incarnate Word v. Int'l Med.</u>

<u>Equip. Collaborative</u>, No. 03-00016, 17 Mass. L. Rep. 549, 2004 Mass. Super LEXIS 223 at *10

(Apr. 20, 2004) ("[a]lthough the [contract] do[es] not contain an integration clause, the

determination of whether an agreement is integrated does not depend on the existence (sic) an

integration clause."). Accordingly, given the scope of the Contract and the intent of the parties

that the Contract would contain their entire relationship, the alleged prior oral negotiations and

agreement are unenforceable in light of the (written) Contract.

    2.    <u>Systrans' Breach of Contract Claim is Barred by the Statute of Frauds.</u>

The Statute of Frauds bars Systrans' claim of an <u>oral</u> five-year contract. An oral contract

that is not to be performed within a year is unenforceable under the Statute of Frauds. <u>See</u> Mass.

Gen. Laws ch. 259, § 1. Moreover, even if Systrans had performed as alleged, any such

agreement cannot be enforced. <u>Meng v. Trustees of Boston Univ.</u>, 44 Mass. App. Ct. 650, 653,

693 N.E.2d 183, 186 (1998) (holding that "performance, even if full, does not remove a contract

from the operation of G.L. c. 259, § 1, Fifth"). Accordingly, any claims regarding any alleged

agreements to provide work for Systrans are unenforceable as a matter of law.

    3.    <u>The Contract Bars Systrans' Breach of Contract Claim.</u>

The Contract provides that each party's liability under the Contract "or for any other

reason relating to or arising from the products and services provided under this Contract" will be

limited to amounts paid or received under the Contract. <u>See</u> Contract, § III.I. By its own terms,

the Counterclaims are seeking to impose liability that is not related to anything Iron Mountain

has paid or received under the Contract. For instance, had Iron Mountain received services from

Systrans for which Iron Mountain had not paid, then Systrans' claim would be permitted under

the Contract. That is not the case here. Accordingly, Systrans' claim should be dismissed as

barred by the express terms of the Contract.

{B0422755; 3}

**B.      Systrans Has Not Pleaded the Required Elements for a Misrepresentation Claim.**

To recover for negligent misrepresentation, a plaintiff must show that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information. Cummings v. HPG Int'l, Inc., 244 F.3d 16, 20 (1st Cir. 2001) (applying Massachusetts law). Systrans' allegations do not satisfy these required elements and should be dismissed.

> 1.      Systrans Has Not Alleged that it Justifiably Relied to its Detriment, upon any Alleged "Promises" Made by Iron Mountain.

The alleged promises are too vague to support Systrans' reliance allegation. For reliance to be considered justifiable, the representations at issue must be sufficiently specific. See, e.g., Hinchey v. NYNEX Corp., 979 F. Supp. 40, 44 (D. Mass. 1997), aff'd, 144 F.3d 134 (1st Cir. 1998) (denying a fraud claim and stating that "the alleged misrepresentations about his career status were not specific enough so that Hinchey could have reasonably relied on them"). The alleged oral agreement lacks the required specificity, such as the markets Systrans would serve, the services Systrans would provide, and the rates of those services. Simply, the vague nature of the alleged promises cannot support the allegation that Systrans' reliance was, in fact, justifiable. Of course, vagueness is to be expected in the preliminary negotiations leading to execution of the Contract, which clearly defined the parties' duties, obligations and intentions. Accordingly, the negligent misrepresentation claim should not survive.

> 2.      The "Representations" Alleged in the Counterclaim are Promises and Therefore are Not Actionable.

Each and every one of the alleged misrepresentations set forth in the Counterclaims is promissory in nature and thus is not actionable. Generally, false statements of opinion, of

-7-

conditions to exist in the future, or of matters promissory in nature are not actionable.  See Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc., 345 F.2d 617, 622 (1st Cir. 1965) (noting that under Massachusetts law, statements of matters promissory in nature are not actionable); see, e.g., Blacksmith Invs., LLC v. Cives Steel Co., No. 04-CV-10369-NG, 2005 U.S. Dist. LEXIS 7916, at *17 (D. Mass. Jan. 27, 2005) (dismissing the fraud action due to a failure to allege fraud with particularity).  In Blacksmith Investments, the plaintiff alleged that the defendant made promises to pay a third party (in which payment the plaintiff allegedly had an interest) upon completion of that third party's work.  The plaintiff in Blacksmith Investments further alleged that the defendant led the third party to believe that upon completion of its work the third party would be paid.  The Court dismissed the fraud-related claims, holding that the claims rested upon promises of future conduct and were therefore not actionable.  Blacksmith Invs., LLC, 2005 U.S. Dist. LEXIS 7916, at *5-6.

As in Blacksmith Investments, all of the alleged representations, even if believed, are promissory statements.  For example, Systrans alleges that Iron Mountain promised Systrans that Systrans would receive nearly $45 million per year in transportation courier management business for five years.  See Ctrclms., ¶¶ 16.  Accordingly, since the alleged promises are not actionable under a claim for negligent misrepresentation, that claim should be dismissed.

3.     Systrans' Allegations Are Grounded in Intent and Not Negligence and Cannot Support a Negligent Misrepresentation Claim.

Systrans' allegations sound in intentional misrepresentation as opposed to negligent misrepresentation.  Specifically, Systrans alleges that "Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never **intended** to give Systrans this level of business."  Ctrclms., ¶ 29 (emphasis added).  Systrans never alleges that Iron Mountain "failed to exercise reasonable care or competence in obtaining or communicating the

information" <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 20 (1st Cir. 2001) – the basis for a

<u>negligent</u> misrepresentation claim.  Rather, Systrans clearly alleges that Iron Mountain intended

to deceive Systrans from the start.  Systrans' allegations concern Iron Mountain's intent and not

its negligence - a distinction with a difference.  For instance, by pleading negligence, Systrans is

apparently attempting to avoid a need to plead fraudulent intent with the particularity required by

Fed. R. Civ. P. 9(b).  Such gamesmanship should not be condoned by the Court.

<u>Conclusion</u>

For the foregoing reasons, Iron Mountain respectfully requests that this Court dismiss

Systrans' counterclaims with prejudice.

Respectfully submitted,

**IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.**

By its attorneys,

July 14, 2005

_____/s/ Samual A. Miller_____
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

-9-

# EXHIBIT A



# CONTRACT FOR LOGISTICS MANAGEMENT SERVICES
## CONTRACT No. 2002111

**THIS CONTRACT,** made and entered into as of this 1st day of May 2003, by and between Iron Mountain Records Management, a division of Iron Mountain Information Management, Inc., with an address of 1000 Campus Drive, Collegeville, Pa. 19426 (hereinafter called "IMC") and, as used in this Contract, these terms shall include any present or future entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with IMC and Systrans Freight Systems, Inc., with an address of 571 West Lake Avenue Suite 5, Bay Head, NJ 08742 (hereinafter called "Contractor")

**WITNESSETH,** that the Contractor, for and in consideration of the payments hereinafter specified and agreed to, hereby covenants and agrees to furnish and deliver all and manpower (possessing the particular training, ability, knowledge, and experience), materials and equipment to effectively provide the services for IMC as set forth in this "Contract".
IMC provides storage at its facilities of business, legal, medical and other records for its clients; and such clients frequently request delivery or pickup of containers or files of records, which IMC accomplishes either with its own fleet of vehicles and drivers, or by using third-party couriers.

## I.  TERM

The term of this Contract is as stated on the cover page.  This Contract will automatically renew on a year-to-year basis, unless either party gives written notice of termination, such notice to be given at least 120 days in advance of the termination date.  Notwithstanding the foregoing, IMC may terminate this Contract for convenience at any time during the first six (6) months of the term, upon sixty (60) days' notice.

## II.  SCOPE OF WORK

### A.     General Duties

1.     Transportation Services – Contractor shall immediately upon execution of this Contract begin a study of IMC's courier network, identifying all locations, specific routes and all costs associated with the network.  Contractor shall simultaneously begin negotiations with the current providers of courier services in order to reduce costs and manage the daily operations of the network.  IMC's contractual provisions currently in force with any courier or delivery services shall be respected and managed to their proper conclusion, with the consent of the contractor if study and negotiations so indicate and only as approved in advance by IMC.  Any correspondence regarding existing courier services will be issued by IMC to be enforceable.  The Contractor may seek to modify any such provisions (with this Contract of the contract courier.

The Contractor will provide courier services to the IMC markets, facilities and sites in the continental United States.  Contractor will provide courier services to operate to, from and between Iron Mountain customers and facilities where courier services are not covered by existing contracts, and on a District-by-District basis, as approved by IMC.  Contractor shall comply with all applicable federal, state and local laws, rules and regulations relating to the performance of the Services, including without limitation, all federal, state and local taxes, and social security taxes, applicable federal, state and local laws pertaining to wages,



hours and other terms and conditions of employment. Contractor will observe any customer-required rules and procedures while on premises of IMC customers.

Contractor will provide total coverage of all services on a 7-day, 24-hour basis. Services shall be provided on all IMC observed holidays as requested by IMC. It is also agreed that the Contractor's central dispatch operation will remain staffed until such time as the last scheduled delivery is received at IMC's customer/pickup facility.

Contractor will provide access to the following modes of courier and various transportation services to IMC.
- Ground courier services performed by car, van, or step van.
- Less than truckload services performed by 12'-24' straight truck with or without liftgate.
- Truckload services
- Air courier services – domestic and international – next flight/overnight 2nd day, as a supplement to other primary service contractors and only as specifically directed by IMC.

2.  Management Services – Contractor will provide the following management services to IMC.
- 7-day, 24-hour customer service courier response and 24x7 coverage with services and transactions.
- Selection of vendors to meet both scheduled and on-demand courier services requests.
- Re-negotiation of current vendor courier contracts affected by this Contract while preserving and respecting current terms contained within those Contracts.
- Direct contractual and day-to-day operational supervision of all vendors delivering the services required by the contract.
- Payment of all vendor invoices associated with vendors.
- Provide IMC courier network reporting including delivery times (based on interface with IMC mainframe) and management reporting in the format and within the time parameters requested by IMC.

3.  Technology/Systems Applications – Contractor will provide the following technology to IMC.
- Installation of Contractor's transportation management software at Iron Mountain locations.

4.  Compensation and Billing – IMC shall pay Contractor for the courier network services based on the pricing and conditions listed on Schedules "A", "B", "C", "D", "E". Contractor shall submit electronic invoices to IMC in such form and with such supporting documentation, affidavits, waivers, and releases, as IMC may reasonably request and at the times stipulated. IMC shall pay Contractor weekly following IMC's receipt of Contractor's weekly invoice. Invoice shall provide an attachment with a breakdown showing the activity of each business line services, the date services were performed and the charge for the work performed.

5.  Initial Payment – Upon execution of this Contract, IMC will pay contractor an initial amount of $105,000. This payment will be applied to startup expenses related to the project. Contractor will credit IMC $2,000 per week off the weekly invoice. In the event this contract is cancelled, IMC may offset the full amount outstanding, and



Contractor shall reimburse IMC for any portion of the initial amount not offset. Contractor hereby grants IMC a security interest in the equipment purchased by Contractor at the inception of this Agreement. Upon request, Contractor will execute UCC financing statement to perfect this security interest.

**B.     Contractor Employees and Subcontractors**

It is expected that Contractor's employees, and any subcontractors and their respective employees collectively known as "Personnel" assigned to this account will have frequent, personal contact with customers, employees, visitors and vendors of IMC. Accordingly, it is agreed that the Contractor's employees and subcontractors shall meet the highest standard of appearance and demeanor. Contractor's personnel shall, at all times, demonstrate a high degree of professionalism in their treatment of IMC's customers, employees, visitors and vendors of IMC as is appropriate to the environment, conduct and business of IMC. If any customer requests that any personnel cease servicing such customer, Contractor shall immediately cause such individual to stop servicing the requesting customer.

Contractor shall require all of its on-site personnel to meet the approval of IMC. All personnel shall be bonded. IMC shall receive a copy of the bonds covering personnel.

Contractor shall ensure that all personnel assigned to operate a motor vehicle, or other such equipment, meet all special licensing requirements. All drivers must possess and maintain a safe driving record.

Contractor shall ensure that all assigned personnel pass a comprehensive pre-employment background and reference check as is acceptable to IMC and comparable to that undertaken by IMC on its own employees, including but not limited to fingerprinting, credit checks, criminal background checks and pre-employment drug testing. Contractor shall periodically perform random updates and checks as deemed necessary to insure continued compliance.

IMC reserves the right to fingerprint and photograph all employees assigned under this Contract, or require that Contractor perform same, and subject Contractor personnel to any other security related pre-employment screening that is regularly required of IMC personnel.

Contractor will ensure that all in-house foot messengers and drivers wear appropriate business attire and carry proper identification issued and validated by Contractor. Further, personnel shall present any such additional identification necessary to confirm the validity of Contractor-supplied identification, such as a valid driver's license.

Contractor will recruit, employ, train, supervise, direct, discipline, and, if necessary, discharge Contractor's employees working at IMC facilities, or delivery to customers' sites. Contractor's employees shall be able, qualified, and trained personnel who shall be responsible solely to Contractor. Contractor agrees to transfer or otherwise remove any Contractor personnel requested by IMC at IMC's sole discretion, with or without cause. Contractor will require the same of all subcontractors and their personnel.

Contractor and IMC acknowledge that Contractor is an independent contractor and that neither Contractor nor its personnel are employees of IMC. Further, it is agreed and assured that Contractor and its personnel will not participate in or be entitled to any benefits under IMC's benefit program now existing or hereafter created, including, without limitation, IMC's pension plan, profit sharing plan, medical, life or accidental death insurance plans. Personnel shall, at all times, remain employees or Contractor or its Subcontractors, which shall be solely responsible for the payment of



each employee's benefits and entire compensation, including employment taxes, workmen's compensation, and any similar taxes and requirements associated with employment.

Contractor's personnel will comply with all IMC's security regulations regarding entering IMC's facilities and while in the conduct of the services on the IMC premises. Any employee or contractor who disrupts IMC's normal operations shall be removed immediately by Contractor upon IMC's request.

Contractor warrants that all Contractor personnel provided to IMC are US citizens or are legally entitled to accept employment with Contractor or its subcontractors and to perform services under this Contract.

**C.    Set-aside**

Contractor agrees to utilize "8-A" minority owned vendor for services representing 15% of the total revenue received by Contractor under this contract.. Contractor will bill IMC for difference between the vendor rate and the agreed rate for services. Contractor will process "8-A" vendor invoices for direct payment from IMC to vendor.

**D.    Supervision**

Contractor shall be solely responsible for the direction and supervision of all Contractor personnel assigned to the facilities. Contractor shall provide a sufficient number of line supervisory personnel to ensure Contractor's successful performance of its obligations under this Contract.

Contractor shall designate an Account Manager who shall be a member of the Contractor's management team and shall be accessible regarding any communication relevant to the Services.

Contractor's supervisors and the Account Manager shall meet regularly with IMC's designated representatives to monitor performance under this Contract, and to review performance as herein described. It is the Contractor's responsibility to initiate and facilitate these meetings. Contractor's supervisory personnel shall be available at reasonable times to consult with IMC's designated representatives.

IMC, as owner or lessee of its property and facilities, has the exclusive right to control and deny access to those premises for any reason to any individual including the personnel or agents of the Contractor.

Contractor shall insure that all vehicles provided in the performance of the services shall be less than five (5) years of age unless special exception has been granted by IMC, possess adequate two-way communication, and be maintained properly. Vehicles shall be inspected monthly by Contractor and service records reviewed. All vehicles must be secured at all times. Cargo areas will be equipped with proper security measures to protect the interests of IMC. These provisions apply not only to Contractor but to any subcontractors as well.

**E.    Loss/Reconstruction of Documents**

In the event there is a loss or discrepancy, contractor shall cooperate in conducting a full investigation. Contractor will be liable for up to a maximum of $100,000 in reconstruction costs, as defined below.

# Systrans

1. Cost necessary to reconstruct and photocopy related documents and other items involved. IMC agrees to cooperate and reasonably aid Contractor in the reconstruction of the items lost.

2. Reasonable costs of IMC in connection with the reproduction of documents involved.

3. Such other necessary and reasonable costs and expenses as are directly related to the loss and reconstruction of destroyed and related documents.

## III. GENERAL TERMS AND CONDITIONS

### A. Warranty

The Contractor warrants that the services performed under this Contract will be done in a correct and accepted industry standard manner and that all services performed will be free from omissions, errors and miscalculations. This warranty will be effective for a period of 30 days from the date the work is completed, regardless of any termination. Subject to the limitations in Section II E above, the Contractor will remedy any services declared defective or incorrect by IMC and will perform again or rebate the cost of those services as appropriate provided IMC gives the Contractor notice promptly upon discovery.

### B. Contractor Confidentiality

The Contractor and IMC acknowledge that in the negotiation and performance of this Contract, confidential and proprietary information of each has been and will be made available to the other. The parties agree to use reasonable efforts to maintain the confidentiality of such material and not to make any internal use of such material not required under this Contract. Neither party will disclose the information to any third party without prior written authorization from the disclosing party, and will not use the information received by it, except to those of its employees, agents and consultants whose duties justify the need for access to the information provided that such individuals are subject to obligations or secrecy and limited use commensurate in scope with this Contract. These obligations will apply to verbal information as well as specific portions of the information that are disclosed in writing or other tangible form even if not marked to indicate its confidential nature. These obligations will not apply to any of the information which:

1. Was known to the receiving party prior to receipt under this Contract, as demonstrated by the receiving party's records; or

2. Was publicly known or available prior to receipt under this Contract, or later becomes publicly known or available through no fault of the receiving party; or

3. Is disclosed to the receiving party without restrictions on disclosure by a third party having the legal right to disclose the same; or

4. Is disclosed to a third party by the disclosing party without an obligation of confidentiality; or

5. Is independently developed by an employee, consultant, or agent of the receiving party without access to the information as received under this Contract; or



6.  The receiving party is obligated to produce as required by law, lawfully issued subpoena, or a court order, provided that the disclosing party has been given notice thereof and an opportunity to waive its rights or to seek a protective order or other appropriate remedy.

Upon written request of a disclosing party, the receiving party will return all information disclosed in written or tangible form, and the receiving party will destroy all of its copies, excerpts or notes, and files – computer, tape and paper, made by it which contain any portions of the information unless otherwise provided for by the parties

## C.    Governing Law

This Contract shall be governed by the laws of the State of New Jersey.

## D.    Indemnity

To the fullest extent permitted by law, and subject to any limitations expressly set forth in this Contract, Contractor, its agents, employees, servants and subcontractors (collectively, "Indemnifiers") shall hold harmless and indemnify IMC, its affiliated companies (as their interest may appear), its officers, directors, employees, agents and servants (collectively "Indemnitees") from any liabilities, injury, death, penalties, losses, costs, damages, claims, expenses, attorney's fees, expenses of litigation, suits, judgments, liens and encumbrances, arising out of or resulting from the negligence or willful misconduct of Contractor and/or its employees, subcontractors, agents or servants in performing the services under this contract. In the event any legal proceeding is brought against an Indemnitee solely due to any of the above activities, the Indemnifier agrees to defend the interests of the Indemnitee at no cost to the Indemnitee, so long as the Indemnitee provides prompt notice to the Indemnifier of the legal proceeding and permits the Indemnifier sole control over the defense in such legal proceeding.

## E.    Insurance Requirements

1.  All insurance policies of either party affecting this contract shall include a clause or endorsement denying the insurer any rights of subrogation against the other party to the extent rights have been waived by the insured before the occurrence of injury or loss. IMC and Contractor waive any and all rights of recovery against the other for injury or loss due to the hazards covered by policies of insurance required by this contract to the extent of the injury or loss covered thereby. To that end, neither party shall seek to recover under any indemnity hereunder to the extent the loss covered thereby is recovered or recoverable under any policy of insurance carried by such party.

2.  Contractor shall, at its own cost and expense, maintain commercial general liability (CGL) insurance written on a per occurrence basis, to include coverage for Personal Injury, Contractual, Contingent, Products/Completed Operations and Contractual Liability and Broad Form Property Damage, with limits in at least the following amounts:

    $1,000,000 per occurrence Combined Single Limit
    $5,000,000 Umbrella Policy
    $     50,000 per occurrence limit for Fire Legal Liability
    $      5,000 per person per occurrence limit for Medical expenses



3.  Contractor shall, at its own cost and expense, maintain commercial business auto liability insurance in an amount of not less than $1 million combined single limit. Such policy shall include coverage for all vehicles owned, hired, non-owned and borrowed by the Contractor or any of its subcontractors in the performance of the services covered by this contract.

4.  Contractor shall at its own cost and expense, maintain Workers' Compensation Insurance, unemployment compensation insurance and any other insurance that may be required by law with respect to Contractor's employees and in accordance with statutory requirements for all states in which services are to be performed under this contract. Minimum employer's liability limits are:

    $500,000 Bodily injury by accident, for each accident
    $500,000 Bodily injury by disease, for each employee
    $500,000 policy limits for bodily injury by disease

5.  All insurance policies or bonds required by this Contract shall be issued by insurance companies with a Best Rating or Standard and Poor's Claims-paying ability rating of not less than "A".

6.  Upon IMC's written request, Contractor shall provide IMC a certificate of insurance evidencing such required coverage.  In addition, IMC shall be notified of any cancellation of such policies with at least ten (10) days' prior written notice.

7.  Contractor's liability insurance shall identify IMC as an additional insured.

8.  Contractor shall require that each subcontractor used by Contractor in providing the services hereunder must carry the same insurance as is required to be carried by Contractor.

9.  Contractor shall, at its own cost and expense provide cargo insurance coverage in the amount of $100,000.  Cargo insurance to include "Reconstruction of Documents" endorsement

**F.    Contractor Employees**

Contractor shall recruit, hire, train, supervise, direct, and if necessary, discipline, transfer and discharge management and non-management employees of Contractor performing services hereunder. All personnel employed by Contractor shall at all times and for all purposes be solely in the employment of Contractor while performing the services described herein.  Contractor agrees to comply with all federal, state and local laws and regulations applicable to Contractor as employer, including but not limited to those relating to employee withholding, unemployment taxes, workers compensation insurance and equal employment opportunity.  It is understood and agreed that Contractor is an independent supplier, and is not an agent of IMC.

**G.    Amendments**

No amendment of this Contract will be effective unless it is reduced to writing and executed by both appropriate and authorized signatory parties of the Contract. In the event of the need to implement a change order IMC will discuss the scope of Contract with the Contractor and adjust the compensation relative to the increase or decrease of services required.



**H.    Termination**

*This Contract may be terminated upon written notice, upon the occurrence of the following conditions:*

      1.   IMC may terminate if:

          A.   Contractor fails to provide adequate service during the first 180 days of service.

          B.   Contractor breaches a material provision of this Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from IMC specifying the breach.

          C.   A petition is filed by or against Contractor under bankruptcy law or any other insolvency laws providing for the relief of debtors, termination shall be effective immediately upon receipt of written notice from IMC.

          D.   For convenience at any time during the first six (6) months of the term on thirty (30) days' notice.

      2   Contractor may terminate if:

          E.   IMC breaches a material provision of the Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from Contractor specifying the breach.

          F.   A petition is filed by or against IMC under bankruptcy law or any other insolvency laws providing for the relief of debtors; and

The merger or acquisition of IMC into or by another entity shall not constitute a breech which would enable Contractor to terminate this Contract, provided the surviving entity executes a substantially similar Contract with Contractor based upon substantially similar facts and circumstances.

Cancellation of the contract does not relieve the Contractor of the obligation to deliver and perform on outstanding work prior to the effective date of the cancellation. All sums due to Contractor up to the date of termination shall be paid in accordance with the terms of the Contract.

**I.    Limitation of Warranties and Liability**

THE LIMITED WARRANTIES SET FORTH IN THIS CONTRACT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, AND CONTRACTOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE.

Each party's ("First Party") liability to the other party ("Other Party") arising out of this Contract or for any other reason relating to or arising from the products and services provided under this Contract, including claims for contribution or indemnity will be limited to the amounts the First Party has paid to or received from the Other Party under this Contract. IN NO EVENT WILL WITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.



**L.    Assignment**

Contractor may not assign this Contract without the prior written consent of IMC. Subject to the foregoing, this Contract shall be binding upon, and shall inure to the benefit of the successors and assigns of IMC and the Contractor.

**M.    Severability**

If any term or provision of this Contract shall be held unenforceable by a court or competent jurisdiction, the remaining provisions of this Contract shall not be affected by such unenforceability and shall be valid and enforceable to the fullest extent permitted by law.

**N.    Modifications**

Any handwritten changes, to include but not limited to additions, rewordings, deletions, etc. made to the face of this document must be initialed and dated by both appropriate and authorized signatory parties of the Contract to indicate both parties' acceptance and Contract with the change (s) for it to be considered a valid and binding part of the signed Contract.

**O.    Mediation and Arbitration**

The parties agree that any disputes arising in connection with the interpretation of this Contract or the performance of any party under this Contract, or otherwise relating to this Contract, shall be treated in accordance with the procedures set forth in this paragraph. Such treatment shall occur prior to any party pursuing arbitration or litigation in connection with such disputes. The dispute shall be referred for resolution to Garry Watzke for IMC and James Neebling for the Contractor. Such procedure shall be invoked by either the Contractor or IMC presenting to the other a "Notice of Request for Resolution of Dispute ("a Notice") identifying the issues in dispute sought to be addressed hereunder. A telephone or personal conference of those executives will be held within 10 days after the delivery of the Notice.

**P.    Privacy Addendum**

Contractor shall execute the Privacy Addendum in the form annexed to this contract and shall cause each subcontractor to execute the Privacy Addendum as part of such subcontractor's Contract with Contractor, provided that IMC shall have the direct right to enforce the terms of the Privacy Addendum against any subcontractor.





Date: 5/01/03

# SCHEDULE "A"
# HALF DAY / RUSH DELIVERY NORTHEAST

- Rates to be established and inserted after 90 day test period

- Test period rates will not exceed current rates

- New rates to be inserted after test will reflect a minimum savings of 2%, or 98% of current rates





Date: 5/01/2003

# SCHEDULE "C"
# HALF DAY / RUSH DELIVERY
# MIDWEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)





Date: 5/01/2003

## SCHEDULE "D"
## HALF DAY / RUSH DELIVERY SOUTHWEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates





Date: 5/01/2003

# SCHEDULE "E"
## HALF DAY / RUSH DELIVERY
## WEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)



# CONTRACT FOR COURIER SERVICES

**CONTRACT NUMBER:**      2002111         *Confidential*

**CONTRACT TERM:**      **May 1, 2003 through April 30, 2006**

**CLIENT:**

Iron Mountain Records Management,
a division of Iron Mountain
Information Management, Inc.
1000 Campus Drive
Collegeville, Pa 19426

**CONTRACTOR:**

Systrans Freight Systems, Inc.

571 West Lake Avenue, Suite 5
Bay Head, NJ 08742

**SCOPE OF CONTRACT:**

Contractor shall furnish and deliver all the manpower, materials, and equipment to provide logistics/courier management services for specified Iron Mountain facilities, (the "Service Delivery Area"). Management services will be responsible for "Half-Day", "Rush" shipments from IMC facilities to IMC customer sites.

**IN WITNESS WHEREOF**, the parties have caused this Contract to be executed with the intent to be bound by its provisions. Said Contract is indicated and evidenced by the signatures of their duly authorized officers affixed below.

**Authorized Signatures:**

**IRON MOUNTAIN RECORDS
MANAGEMENT, a division of Iron
Mountain Information Management, Inc..**

By:

Print Name:     Bob Miller

Title:     President

Phone:     610-831-2315

Date:     5/12/03

**SYSTRANS FREIGHT SYSTEMS, INC.**

By:

Print Name:     James Neebling

Title:     President

Phone:     732-295-9914

Date:     4/29/03