# United States District Court
# District of Massachusetts

IRON MOUNTAIN INFORMATION
    MANAGEMENT INC.,
        Plaintiff,

    V.                              CIVIL ACTION NO. 05-10999-RCL

SYSTRANS FREIGHT SYSTEMS, INC.,
        Defendant,

_____

SYSTRANS FREIGHT SYSTEMS, INC.,
        Counter-Plaintiff,

    V.

IRON MOUNTAIN INFORMATION
    MANAGEMENT INC.
        Counter-Defendant.

# *REPORT AND*
# *RECOMMENDATION ON MOTION*
# *TO DISMISS COUNTERCLAIMS (#17)*

COLLINGS, U.S.M.J.

## I. INTRODUCTION

On May 13, 2005, Plaintiff and Counter-Defendant Iron Mountain Information Management Inc. ("Iron Mountain") sued defendant Systrans Freight Systems, Inc. ("Systrans") for breach of contract and failure to return certain confidential and proprietary information.[1] (*See generally* Amended Complaint #3) On June 17, 2005, Systrans filed an Answer to the Amended Complaint and Counterclaims against Iron Mountain, in which it lodged claims for breach of contract and negligent misrepresentation. (Answer, Affirmative Defenses and Counterclaims #15).

On July 14, 2005, Iron Mountain filed a motion to dismiss with supporting memorandum on the grounds that Systrans' counterclaims failed to state a claim. (## 17, 18-1) On July 28, 2005, Systrans filed an Opposition to Plaintiff and Counter-Defendant's Motion to Dismiss Counterclaims. (#21)

For the reasons discussed below, the Court shall recommend that the motion to dismiss be allowed as to Count II and allowed as to Count I. As to Count I, there is a likelihood that Iron Mountain will succeed on a motion for

---

[1]

In its Amended Complaint filed May 20, 2005, Iron Mountain included six counts. For purposes of ruling on the instant motion to dismiss, the Court need not set out what each of those six counts is.

2

summary judgment, but a claim is stated and there are too many unanswered questions to permit Count I to be dismissed on the bases which are advanced by Iron Mountain.

## II. RELEVANT FACTS[2]

Prior to January 2001, Iron Mountain and IMIM merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain. (#15, ¶ 1)  Sometime in 2001, J. Peter Pierce ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company. (#15, ¶ 2) Sometime after the merger/acquisition, Pierce was fired as the company's president but remained on its Board of Directors. (#15, ¶ 3)

On or about January 15, 2001, Thomas Carr ("Carr")[3] and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"). (#15, ¶ 5)  A Pierce-controlled entity, Pioneer Capital LLP, and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc., owned

---

[2]

The facts are taken from Systrans' answer since for purposes of ruling on the motion to dismiss, the Court must accept Systrans' version of the facts as Systrans is the non-moving party.

[3]

Carr is the defendant and counter-plaintiff in a lawsuit with Iron Mountain and other individuals. *See* case # 05-cv-10890.

3

Logisteq 51% and 49% respectively. (#15, ¶ 5)  Subsequently, Pierce alone formed a company known as Sequedex which he may have used to compete with Iron Mountain and in doing so posted significant costs to operate Sequedex on the books of Logisteq. (#15, ¶ 6)

Iron Mountain filed suit against Pierce for breach of the merger/acquisition contract. (#15, ¶ 7) Ultimately, an arbitrator found in favor of Pierce. (#15, ¶ 7)

One result of the Iron Mountain/Pierce Leahy merger[4] was that Logisteq became a tenant of Iron Mountain. (#15, ¶ 9)  At some point, Iron Mountain sent a letter to Carr signed by Gary Watzke, ("Watzke") Iron Mountain's general counsel, stating that Logisteq and Carr as well as certain of Carr's businesses were being evicted from property now owned by Iron Mountain. (#15, ¶ 10) Carr protested in writing to Watzke. (#15, ¶ 10)

In August, 2001, at a meeting between senior management of Iron Mountain and Carr, Iron Mountain told Carr that if Carr would assist Iron Mountain in confirming what it already suspected about the activities of Pierce, then Iron Mountain would compensate Carr in various ways. (#15, ¶ 12)

---

[4]

For simplicity's sake, the term "merger" is used since Systrans is unclear whether the transaction was actually a merger or an acquisition.

4

Thereafter, a series of meetings occurred with the plaintiffs and Carr and his counsel, Arthur Peslak ("Peslak"), and Carr's friend James Neebling ("Neebling"), principal of Systrans; some of these meetings occurred on March 19, 2002, March 26, 2002, April 2, 2002, April 9, 2002, July 16, 2003 and September, 2003. (#15, ¶ 14)

At one of these meetings, Iron Mountain and one or more of its agents promised that, in consideration for Carr and Neebling providing information and cooperation in the Pierce arbitration, $45 million in transportation courier management business would be given to Systrans each year for five years. (#15, ¶ 16) Systrans was a small business worth less than $1 million and employing fewer than 15 people. (#15, ¶ 17) In reliance on Iron Mountain's promises, Systrans created software that was specifically designed to manage effectively third-party courier and transportation services for Iron Mountain. (#15, ¶ 17) Neebling, on behalf of Systrans, purchased hundreds of thousands of dollars of computer software and hardware and devoted two and a half years of work to evaluating Iron Mountain's systems and creating software and technologies that have saved Iron Mountain millions of dollars. (#15, ¶ 17) Systrans' technology was designed and capable of handling the $45 million in business that Iron Mountain promised would be forthcoming. (#45, ¶ 17)

As part of Neebling's analysis of Iron Mountain's systems, he uncovered and disclosed problems with Iron Mountain's management of such systems. (#15, ¶ 18)  These problems encompassed many areas, including violations of Department of Transportation regulations and failure to comply with various insurance regulations. (#15, ¶ 18)  Iron Mountain refused to let Systrans fix these problems or to create a mechanism for Iron Mountain to remedy these deficiencies. (#15, ¶ 18)

In the Spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce regarding Logisteq to coincide with the action that Iron Mountain was planning to file against Pierce. (#15, ¶ 20)  Iron Mountain drafted the complaint for Carr to file and agreed to fund Carr's lawsuit. (#15, ¶ 20)  The draft of the complaint was delivered to Carr while he was on vacation in California; Carr signed the complaint and Iron Mountain coordinated the filing of the action. (#15, ¶ 26)

On March 26, 2002, Carr and Neebling met with Iron Mountain CFO Kenny ("Kenny"), Iron Mountain CEO Reese ("Reese") and Attorney Watzke at Iron Mountain's corporate headquarters in Boston. (#15, ¶ 21)  Reese offered $5 million to Carr so that Carr could buy out Pierce's share of Logisteq. (#15, ¶ 21)  Reese also promised that Iron Mountain would hire Carr as a

transportation consultant and provide $25 million in courier business to Systrans. (#15, ¶ 21)   During that same conversation, Kenny stated that revenues of more than $45 million would be paid to Systrans each year for a period of five years in return for the cooperation of Carr and Neebling. (#15, ¶ 21)

On April 9, 2002 at a dinner in New York city, Attorney Larry Varn ("Varn") promised that Iron Mountain would wire a $50,000 retainer to Peslak, Carr's counsel in disputes involving Pierce. (#15, ¶ 22)   That transaction was completed two days later. (#15, ¶ 22)

As consideration for Carr's involvement in Iron Mountain's lawsuit against Pierce, Kenny called Carr and promised that, in exchange for Carr's participation, Iron Mountain would fund Carr's lawsuit, including all legal fees and costs and that Iron Mountain would provide business to Systrans in excess of $45 million, hire Carr as a consultant with the same salary and benefits he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations. (#15, ¶ 24)

Kenny made these same promises to Carr's wife, Judy, in a separate telephone conversation that occurred in April, 2002 while the Carr family was in California on vacation. (#15, ¶ 25)  Kenny also advised Judy that all negative

7

financial fall out from her husband's filing of a complaint against Pierce and his other cooperation with Iron Mountain would "be taken care of" by Iron Mountain. (#15, ¶ 25)

During the ensuing months, Carr and Neebling cooperated completely with Iron Mountain by meeting with witnesses, reviewing and investigating commercial transactions involving Pierce and turning over documents and other materials to Iron Mountain. (#15, ¶ 27) Some of the Iron Mountain attorneys shared pleadings and depositions from the Pierce arbitration with Neebling and asked for Neebling's analysis of the pleadings and testimony. (#15, ¶ 27) In direct and full reliance on the promises of consideration, Neebling continued to cooperate with Iron Mountain and as a result has virtually lost the entire Systrans business due to Iron Mountain's failure to provide Systrans with the $45 million in revenue for five years, as promised. (#15, ¶ 28)

Systrans alleges that Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans the level of business that Iron Mountain promised. (#15, ¶ 29) Moreover, says Systrans, Iron Mountain's promises were designed merely to ensure Neebling and Carr's cooperation in the Pierce arbitration. (#15, ¶ 29) Once Iron Mountain lost the arbitration, it began systematically to "strangle" Systrans economically by not providing it with enough revenue to survive. (#15, ¶ 29) All of the aforementioned promises were, according to Systrans, made by Iron Mountain with no intention of fulfilling them. (#15, ¶ 31)

In September, 2003, Carr and Neebling attended a meeting with Varn and Attorney Moore ("Moore") during which Varn promised $2 million to Carr for Carr to use to pay off certain debts incurred in the previous year or two. (#15, ¶ 30) Despite repeated requests from Carr, Peslak and Neebling, for the period from the Fall of 2003 through the early months of 2005, Iron Mountain refused to fulfill its promises, continuing to use as an excuse the pendency of the appeal of the Pierce arbitration. (#15, ¶ 32)

Although Systrans does not mention it in its Counterclaim, Systrans and

Iron Mountain entered into a written contract on May 1, 2003. (#3, ¶ 6)[5] The contract provided that Systrans would "furnish and deliver all...manpower,...materials and equipment to effectively provide the [transportation and courier] services" for Iron Mountain. (#18-1, Exh. 1 at 1) In return, Iron Mountain would compensate Systrans. (#18-1, Exh. 1 at II.4) The contract also provided that it would be "governed by the laws of the State of New Jersey." (#18-1, Exh. 1 at III.C)

### III.  STANDARD

The Rule 12(b)(6) pleading standard is familiar:  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claims that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957) (footnote omitted).  When addressing a motion to dismiss, it is incumbent upon the Court to accept "'the allegations in the complaint as true and mak[e] all

---

[5]

A copy of the contract (the "contract") is attached as Exhibit 1 to Iron Mountain's Memorandum in Support of Motion to Dismiss Counterclaims. (#18-1) Although the Court generally cannot consider documents outside the pleadings in ruling on a motion to dismiss, when such documents are integral to the allegations in the complaint and the authenticity is not challenged, as here, the Court may utilize such documents. *See Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 17 (1 Cir., 1998)(citations omitted)(When "a complaint's factual allegations are expressly linked to–and admittedly dependent upon–a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Thus, the Court shall consider the contract in reaching its decision on the instant motion.

reasonable inferences in favor of plaintiff'". *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied,* 541 U.S. 1031 (2004) citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1 Cir., 1994).   That general proposition notwithstanding, "bald assertions, . . . subjective characterizations, optimistic predications, or problematic suppositions" need not be credited.  *United States v. AVX Corp.*, 962 F.2d 108, 115 (1 Cir., 1992)  (internal quotations omitted); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1 Cir.), *cert. denied,* 543 U.S. 820 (2004).

## IV.  ANALYSIS

### A.  Breach of Contract Claim (Count I)

Iron Mountain moves to dismiss the breach of contract counterclaim on three grounds: (1) the oral agreement (which Iron Mountain disputes even exists) has been superseded by a written instrument; (2) the oral agreement runs afoul of the Statute of Frauds, and (3) Systrans' claim is barred by the express terms of the contract. (#18-1 at 1)  Systrans in turn argues that: (1) the oral agreement is enforceable; and (2) there is no Statute of Frauds problem under New Jersey law, which Systrans asserts is applicable to this case. (#21

at 2-3)[6]

As mentioned above, the contract sets out that it is to be governed by New Jersey law.  Thus, the Court shall apply New Jersey law unless there is a reason to apply Massachusetts law.[7]  The first issue that must be addressed is whether the oral agreement relied upon by Systrans is enforceable.  Systrans' position is that the written contract does not supersede the oral agreement because the written contract does not contain an integration clause and because the two agreements "involve the same subject matter and are wholly consistent with each other." (#21 at 8)

In support of its position, Systrans relies heavily on *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F. Supp.2d 788 (D.N.J., 2005).  However, in that case (notably a summary judgment case), the court denied summary judgment in favor of the plaintiff on defendant's breach of contract counterclaim, finding that there was a genuine issue of material fact as to whether plaintiff breached a certain term of the written agreement. 357 F.

---

[6]

Systrans does not address Iron Mountain's argument that Systrans' claim is barred by the express terms of the contract.

[7]

The oral contract as alleged by Systrans was made in Massachusetts; one of the unanswered questions with respect to the motion is whether Massachusetts or New Jersey law applies to the oral contract; New Jersey law clearly applies to the written contract.

Supp.2d at 800.  That is, the contract being sued upon was the written contract entered into by the parties, not--as in the instant case--the oral agreement that preceded the written contract.  The court did state that it would allow parol evidence of the prior oral communications between the parties to come in to support a claim of fraud in the inducement. 357 F. Supp.2d at 796.

Thus, the *Travelodge* case does little to support Systrans' stance.  In the case at bar, Systrans is not seeking to rely on parol evidence of the oral communications between it and Iron Mountain but is actually suing upon the purported "oral contract."[8]  Therefore, what needs to be resolved is whether Systrans sufficiently has stated a claim for breach of contract where it is relying on an oral agreement that was undisputedly followed by a written contract addressing the same topic.

In New Jersey, the "general rule is that an executed contract which covers the whole subject matter embraced in a prior one between the same parties rescinds the prior agreement." *Winans v. Asbury Park Nat. Bank & Trust Co.*, 13 N.J. Super. 577, 581, 81 A.2d 33, 35 (1951).  The *Winans* court held that the

---

[8]

Systrans relies on similarly inapposite cases in which there were two or more writings that were all part of one transaction. (#21 at 9) Here, there is no dispute that there is only one written contract, and there may or may not have been prior oral agreements about the same subject.  To the extent that Systrans is arguing that the two "agreements" must be read together because they involve the same subject matter, that argument is addressed *infra*.

"prior agreement was superseded by the latter" where the "parties to the agreement were the same, and the subject matter was the same" but the terms were "inconsistent." 13 N.J. Super. at 581, 81 A.2d at 35.  However, it "is primarily a question of the intention of the parties to be ascertained from the contracts themselves whether the earlier contract is discharged and superseded by a new contract." *Rosenberg v. D. Kaltman & Co.*, 28 N.J. Super. 459, 464, 101 A.2d 94, 96 (1953).

In the instant case, it is impossible to say at this juncture that the terms of the oral agreement and the written contract are inconsistent.  The written contract is silent as to how much business Iron Mountain was going to provide to Systrans.  It is possible that the two agreements could be construed together–the oral agreement was that Iron Mountain would provide $45 million in courier business to Systrans over a period of five years and the written agreement set forth all of the other terms agreed to by the parties.  Moreover, it is not appropriate at the motion to dismiss stage to analyze the intentions of the parties; that is better done at the summary judgment stage or at trial.  Thus, Systrans adequately has set out a claim for breach of an oral contract.

Iron Mountain's next argument is that the Statute of Frauds bars Carr's

14

claim of an oral five-year contract between Iron Mountain and Systrans pursuant to which Iron Mountain would give Systrans courier business of $45 million each year for a period of five years. Systrans' position is that such an agreement is not barred by the Statute of Frauds under New Jersey law because New Jersey has eliminated the "one year rule."

In support of its argument, Systrans cites to N.J.S.A. 25:1-5. It is true that this statute does not include a requirement that a contract to be performed over a period of more than one year must be in writing. *Compare* Mass. Gen. L. c. 259, § 1 ("No action shall be brought... [u]pon an agreement that is not to be performed within one year from the making thereof...[u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing...."). Thus, under New Jersey law, the oral agreement between Iron Mountain and Systrans, if it existed at all, would not have to have been reduced to writing in order to be enforceable even though it was to be completed over a period of five years. And, therefore, Iron Mountain's Statute of Frauds argument is without merit at this juncture.

The Statute of Frauds argument is better addressed at the summary judgment stage after some of the factual and legal issues have been

clarified–*e.g.,* whether there is any evidence that the purported oral contract was reduced to writing, whether the agreement could have been completed within one year, whether Massachusetts law rather than New Jersey law should apply.  Therefore, the Court shall not recommend dismissal of the breach of contract claim pursuant to the Statute of Frauds.

Iron Mountain's last argument on the breach of contract claim, unrebutted by Systrans, is that the claim is barred by the express terms of the contract.  Iron Mountain refers to Section III.I of the contract in support of its position.  That section sets out, in relevant part, that: "Each party's ("First Party") liability to the other party ("Other Party") arising out of this Contract or for any other reason relating to or arising from the products and services provided under this Contract...will be limited to amounts the First Party has paid to or received from the Other Party under this Contract."

While it is certainly conceivable that this limitation of liability clause would bar Systrans' breach of contract claim, the Court is loathe to make such a final determination at this early stage.  From the language of the clause–specifically, "for any other reason relating to or arising from the products and services under this Contract"–it is apparent that a strong argument could

be advanced that Systrans' damages for breach of the oral contract with Iron Mountain would be limited to what Systrans paid to Iron Mountain since the oral agreement dealt with the same services (i.e., courier services) as the written contract.

However, it is too early in the case to make a decision as to whether such a limitation of liability provision is enforceable. Under New Jersey law, "[a]ny provision limiting liability...must be written in plain and clear language, entered into by equal bargaining partners,...not run contrary to the public interest....nor can it be unconscionable." *Morgan Home Fashions, Inc. v. UTI, U.S., Inc.,* 2004 WL 1950370, *4 (D.N.J., Feb. 9, 2004) (citations omitted). Thus, before a determination can be made as to whether the clause is enforceable, there must be some factual discovery undertaken. For example, Systrans will argue, as it set out in its counterclaim, that it was not an equal bargaining partner with Iron Mountain. Iron Mountain likely will disagree. Discovery will aid the Court in answering some of the factual questions necessary before a decision is reached as to the enforceability of the limitation of liability provision. Therefore, the Court shall recommend that Iron Mountain's motion to dismiss Systrans' breach of contract counterclaim be denied.

### B. Negligent Misrepresentation (Count II)

Iron Mountain argues that the negligent misrepresentation claim should be dismissed because: (1) Systrans has not alleged that it relied to its detriment on any promises made by Iron Mountain; (2) the representations alleged in the counterclaim are promises and therefore are not actionable, and (3) Systrans' allegations are grounded in intent and not negligence and thus cannot support a negligent misrepresentation claim. (#18-1 at 7-9)  Not surprisingly, Systrans disagrees, asserting that it has successfully pleaded all of the required elements of negligent misrepresentation. (#21 at 3)

In order to state a claim for negligent misrepresentation under New Jersey law, the plaintiff must allege that an incorrect statement was negligently made and justifiably relied upon. *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138, 143 (1983), *superseded by statute on other grounds; see also Falzo v. County of Essex*, 2005 WL 2129927, *6 (D.N.J., Aug. 31, 2005)(citing *Kaufman v. i-Stat. Corp.,* 165 N.J. 94, 754 A.2d 1188 (2000)(quoting *Rosenblum*, 93 N.J. at 334))("A negligent misrepresentation is (1) an incorrect statement that was (2) negligently made, (3) justifiably relied on, and that (4) may be the basis for recovery of damages for economic loss sustained as a consequence of that

18

reliance."). Quite simply, Systrans has failed to plead the requisite elements of negligent misrepresentation and therefore that claim must be dismissed.

Nowhere in the counterclaim does Systrans allege that Iron Mountain made any of its promises negligently nor does Systrans plead that Iron Mountain failed to exercise reasonable care in obtaining or conveying information to Systrans. Indeed, Systrans alleges that Iron Mountain made the relevant representations with fraudulent intent. *See* #15 at ¶ 29 ("Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans this level of business. Iron Mountain's representations were...designed merely to ensure Neebling and Carr's cooperation in Iron Mountain's prosecution of its arbitration action against Pierce."); #15 at ¶ 31 ("All of the aforementioned...promises...were made with absolutely no intention of fulfilling or otherwise satisfying said obligations."); #15 at ¶ 42 ("at the time the statements were made Iron Mountain did not intend to honor its promises, making the statements to Systrans false when they were made.").

Thus, in short, even viewing the counterclaim in the most favorable light, Systrans has failed to state a claim for negligent misrepresentation because it

has not included some of the requisite elements and as such, the claim must be dismissed.[9]     Because the Court shall recommend that the negligent misrepresentation claim be dismissed, the Court need not address any of Iron Mountain's other arguments regarding this claim.

## V.  CONCLUSION

For the aforementioned reasons, I RECOMMEND that Iron Mountain's Motion to Dismiss Counterclaims (#17) be DENIED as to Count I (breach of contract) and ALLOWED as to Count II (negligent misrepresentation).

## VI.  REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to this report and

---

[9]

Systrans has come closer to pleading a claim for fraudulent misrepresentation. Such a claim would, however, require strict compliance with the particularity requirements of Fed. R. Civ. P. 9(b) whereas a claim for negligent misrepresentation, at least under New Jersey law, is not subject to Rule 9(b). See *In re Cendant Corp. Securities Litig.,* 190 F.R.D. 331, 337 (D.N.J., 1999) (quoting Wright & Miller, *Fed. Pract. and Proc.:* Civil 2d § 1297, 615 (1990)) ("By its terms, the particularity requirement in Rule 9(b) applies only to averments of fraud. Since the rule is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses.") *Compare Bamberg v. SG Cowen*, 236 F. Supp.2d 79, 91 (D.Mass., 2002) (noting that courts in Massachusetts "are split on whether Rule 9(b) should apply to negligent misrepresentation claims.")

recommendation must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review.  *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *United States v. Vega,* 678 F.2d 376, 378-79 (1 Cir., 1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983).  *See also Thomas v. Arn,* 474 U.S. 140 (1985).


/s/ *Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

May 25, 2006.